UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

EDWARD OLVERA, CARLA DE ROSE,
Individually and as Guardian
Ad Litem for AND-O, CHD-O,
COD-O, SD-O, AGD-O, GD-O,
RD-O, minor children, SUSAN
MORRISON, KELLY MEIS,

      Plaintiffs,

    v.

COUNTY OF SACRAMENTO, JEANINE
LOPEZ, FERMINE PEREZ, JENNIFER
CULLIVAN, BRYAN JONES, ROBIN
ROGERS, KEEVA PIERCE, VERONICA
CARILLO, STEPHANIE LYNCH, LYNN
FRANK, SOLLA, LAURA COULTHARD,
and Does 1 through 20,

      Defendants.

_____/

NO. CIV. 2:10-550 WBS CKD

ORDER RE: MOTIONS FOR SUMMARY
JUDGMENT AND MOTION TO APPOINT
GUARDIAN AD LITEM

----oo0oo----

      Plaintiffs brought this civil rights action under 42

U.S.C. § 1983 against defendants the County of Sacramento, the

Department of Health and Human Services ("DHHS"), Child

Protective Services ("CPS"), CPS employees, and Sacramento County

counsel based on an investigation by CPS and the removal of a

1

minor child from plaintiffs Edward Olvera and Carla DeRose's home.  Presently before the court are two motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 and plaintiffs' motion to appoint a guardian ad litem for the minor children plaintiffs pursuant to Rule 17.

I.   <u>Factual and Procedural Background</u>

Plaintiffs and spouses Olvera and DeRose are licensed marriage and family therapists and are the natural parents of minor plaintiff RD-O.  As of December 2008, Olvera and DeRose were the adoptive parents of minor plaintiffs SD-O, COD-O, and GD-O, were in the process of adopting minor plaintiffs AGD-O and AND-O, and had filed an incomplete adoption request for the adoption of minor plaintiff CHD-O.  Until Olvera and DeRose adopted CHD-O on May 24, 2010, his adoptive parents were plaintiffs Susan Morrison and Kelley Miess.

In 2006, Olvera and DeRose began a therapeutic program in their home for adopted children suffering from severe emotional, psychological, and behavioral disorders in which the children lived in the Olvera/DeRose home and received treatment and education.  In November 2007, Olvera and DeRose purchased a larger home and enrolled more children in their full-time, in-home program.

In December 2008, CPS received a report from a mandatory reporter that a child named Russell claimed he was subject to abuse when he previously lived in the Olvera/DeRose home.  Based on this report, CPS began an investigation and the case was assigned to defendant Jeannine Lopez.  On December 19, 2008, Lopez interviewed several children living in the

2

Olvera/DeRose home at their school and, later that evening, went to the Olvera/DeRose home with defendant Claudia Solla and two police officers to interview other children residing at the home. Plaintiffs allege that the interviews on December 19, 2008, were performed without consent in violation of the Fourth Amendment. Defendant Wendy Christian, a CPS employee, also returned to the Olvera/DeRose home on January 6, 2009, and allegedly entered the home without consent in violation of the Fourth Amendment.

Based on Lopez's investigation and discussions during several "staffings" with CPS employees and County counsel, it was decided that Lopez would seek a protective custody warrant for the removal of AGD-O, AD-O, and CHD-O from the Olvera/DeRose home. To seek the removal of CHD-O, Lopez began drafting an application for a protective custody warrant ("PCW"), which may have been edited by defendant Eva Schrage and County counsel defendants Lisa Travis and Christopher Guillon. Plaintiffs allege that the PCW for the removal of CHD-O contained misrepresentations and omitted exculpatory evidence in violation of the Fourth Amendment. The juvenile court ultimately issued a protective custody warrant for the removal of CHD-O, but denied the applications for protective custody warrants for the removal of AGD-O and AD-O.

Pursuant to the protective custody warrant, CHD-O was removed from the Olvera/DeRose home on February 5, 2009, and placed in foster care while contested detention hearings were conducted. Ultimately, a settlement agreement was reached in which CHD-O was allowed to return to the Olvera/DeRose home under certain conditions.

3

In their Third Amended Complaint ("TAC"), plaintiffs assert the following eight claims:

1) the minor children plaintiffs' § 1983 claim against Lopez and Solla based on violations of their Fourth Amendment rights;

2) CHD-O's § 1983 claim against all defendants based on violation of his Fourth Amendment right;

3) all plaintiffs' § 1983 claim against all defendants based on violations of their Fourteenth Amendment rights to familial association caused by the removal of CHD-O from the Olvera/DeRose home without procedural due process;[1]

4) all plaintiffs' § 1983 claim against all defendants based on violations of their Fourteenth Amendment rights to familial association caused by the continued detention of CHD-O and "conspiracy to commit fraud upon the juvenile court and abuse the lawful processes of the court through repeated submissions of false evidence, misrepresentation, and the withholding of exculpatory evidence" without procedural due process, (Third Am. Compl. ¶ 157 (Docket No. 75));

5) all plaintiffs' § 1983 claim against all defendants based on violations of their First Amendment rights of association;

6) all plaintiffs' state law claim for intentional infliction of emotional distress against Lopez and Solla;

7) all plaintiffs' state law claim for intentional infliction of emotional distress against all individual defendants; and

---

[1]    At oral argument, plaintiffs confirmed that their third and fourth claims are limited to alleged denials of procedural due process and do not allege a denial of substantive due process.

1     8) all plaintiffs' § 1983 claim against all defendants based

2 on violations of their Fourth Amendment rights when Christian

3 entered the Olvera/DeRose home.

4          The County of Sacramento, DHHS, CPS, and the CPS

5 employee defendants now move for summary judgment on all of

6 plaintiffs' claims pursuant to Rule 56 ("County's motion").

7 County counsel defendants Travis and Guillon also seek summary

8 judgment on the claims against them, primarily on the ground of

9 absolute immunity.  Plaintiffs have also requested that the court

10 appoint DeRose as guardian ad litem for the minor plaintiffs

11 before addressing any of the minor plaintiffs' claims.

12          In their opposition to the County's motion, plaintiffs

13 indicate that they waive their fifth claim under § 1983 based on

14 alleged violations of the First Amendment and all claims against

15 defendants Fermine Perez, Laura Coulthard, Lynn Frank, Joni

16 Edison, Keeva Pierce, Stephanie Lynch, Veronica Carrillo, Fred

17 Demartin, Kim Pearson, Patti Gilbert-Driggs, and Melinda Lake.

18 (Pls.' Opp'n to Cnty.'s Mot. at 2:4-11 (Docket No. 146).)

19 Plaintiffs also indicate that they waive all claims based on

20 defendants' alleged conspiracy to retaliate against Olvera based

21 on his alleged prior "whistleblwoing" activity while previously

22 employed with CPS.  (Id. at 1:15-17.)

23 II.  Discussion

24     A.  Motion to Appoint Guardian Ad Litem

25          Pursuant to Federal Rule of Civil Procedure 17(c), "[a]

26 minor or an incompetent person who does not have a duly appointed

27 representative may sue by a next friend or by a guardian ad

28 litem."  Fed. R. Civ. P. 17(c).  Rule 17(c) provides that the

"court must appoint a guardian ad litem--or issue another appropriate order--to protect a minor or incompetent person who is unrepresented in an action." Id.  Recognizing that a motion to appoint a guardian ad litem should have been filed earlier in this action, plaintiffs now request the court to appoint DeRose as a guardian ad litem for the minor children plaintiffs (AND-O, CHD-O, COD-O, SD-O, AGD-O, GD-O, and RD-O) nunc pro tunc to the date this action was filed.  All defendants have filed statements of non-opposition to this request.  (Docket Nos. 157 & 158.) Accordingly, the court will grant plaintiffs' motion to appoint DeRose as guardian ad litem for the minor children plaintiffs nunc pro tunc to the date this action was filed.

     B.   Motions for Summary Judgment

       Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Alternatively, the moving party can demonstrate that the non-moving party cannot produce evidence to support an essential element upon which it will bear the burden of proof at trial.

6

1  Id.

2      Once the moving party meets its initial burden, the

3  burden shifts to the non-moving party to "designate 'specific

4  facts showing that there is a genuine issue for trial.'"  Id. at

5  324 (quoting then-Fed. R. Civ. P. 56(e)).  To carry this burden,

6  the non-moving party must "do more than simply show that there is

7  some metaphysical doubt as to the material facts."  Matsushita

8  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

9  "The mere existence of a scintilla of evidence . . . will be

10  insufficient; there must be evidence on which the jury could

11  reasonably find for the [non-moving party]."  Anderson, 477 U.S.

12  at 252.

13      In resolving a summary judgment motion, the court must

14  view the evidence in the light most favorable to the non-moving

15  party and draw all justifiable inferences in its favor.  Id. at

16  255.  "Credibility determinations, the weighing of the evidence,

17  and the drawing of legitimate inferences from the facts are jury

18  functions, not those of a judge . . . ruling on a motion for

19  summary judgment . . . ."  Id.

20      In relevant part, § 1983 provides,

21      Every person who, under color of any statute, ordinance,
        regulation, custom, or usage, of any State . . . ,
22      subjects, or causes to be subjected, any citizen of the
        United States . . . to the deprivation of any rights,
23      privileges, or immunities secured by the Constitution and
        laws, shall be liable to the party injured in an action
24      at law, suit in equity or other proper proceeding for
        redress . . . .
25

26  42 U.S.C. § 1983.  While § 1983 is not itself a source of

27  substantive rights, it provides a cause of action against any

28  person who, under color of state law, deprives an individual of

7

1   federal constitutional rights or limited federal statutory

2   rights.  Id.; Graham v. Connor, 490 U.S. 386, 393-94 (1989).

3          In § 1983 actions, "qualified immunity protects

4   government officials 'from liability for civil damages insofar as

5   their conduct does not violate clearly established statutory or

6   constitutional rights of which a reasonable person should have

7   known.'"  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting

8   Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  "The test for

9   qualified immunity is: (1) identification of the specific right

10  being violated; (2) determination of whether the right was so

11  clearly established as to alert a reasonable officer to its

12  constitutional parameters; and (3) a determination of whether a

13  reasonable officer would have believed that the policy or

14  decision in question was lawful."  McDade v. West, 223 F.3d 1135,

15  1142 (9th Cir. 2000).  The Supreme Court recently held that a

16  court may assume the existence of a constitutional violation

17  under the first inquiry for purposes of the qualified immunity

18  analysis.  Pearson, 555 U.S. at 236.

19         The clearly established inquiry "serves the aim of

20  refining the legal standard and is solely a question of law for

21  the judge."  Tortu v. Las Vegas Metro. Police Dep't, 556 F.3d

22  1075, 1085 (9th Cir. 2009).  To be clearly established, "existing

23  precedent must have placed the statutory or constitutional

24  question beyond debate."  Reichle v. Howards, --- U.S. ---, ---,

25  132 S.Ct. 2088, 2093 (2012) (internal quotation marks and

26  citation omitted).  Whether the unlawfulness of certain conduct

27  is clearly established "depends largely 'upon the level of

28  generality at which the relevant "legal rule" is to be

8

identified.'"   Wilson v. Layne, 526 U.S. 603, 614 (1999) (quoting Anderson v. Creighton, 483 U.S. 635, 639 (1987)).   The right must be defined in a "particularized, and hence more relevant, sense," requiring a court to strike a balance between defining a right too generally so that the definition necessarily leads to the conclusion that the right is clearly established and defining the right too narrowly so that prior precedent must mirror the facts of the case in order to conclude that the right has been clearly established.   Saucier v. Katz, 533 U.S. 194, 202-03 (2001).

If the court concludes a right is not clearly established, the official is entitled to qualified immunity.   Id. at 202.   If a right is clearly established, an official is not entitled to qualified immunity unless a reasonable official would not have known that his conduct violated the clearly established right.   See Anderson, 483 U.S. at 640.   The reasonableness inquiry recognizes "that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude" that their conduct comports with the Constitution and thus shields officials from liability when their mistake is reasonable.   Id. at 641.

While different conclusions can be reached on the clearly established and reasonableness inquiries, the two inquiries are usually intertwined, and the Supreme Court has explained that "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."   Saucier, 533 U.S. at 202; see also Messerschmidt v. Millender, --- U.S. ----, ----,

9

1  132 S.Ct. 1235, 1245 (2012) ("[W]hether an official protected by

2  qualified immunity may be held personally liable for an allegedly

3  unlawful official action generally turns on the 'objective legal

4  reasonableness' of the action, assessed in light of the legal

5  rules that were 'clearly established' at the time it was taken."

6  (internal quotation marks and citation omitted) (alteration in

7  original)); <u>Anderson</u>, 483 U.S. at 640 ("The contours of the right

8  must be sufficiently clear that a reasonable official would

9  understand that what he is doing violates that right.").

10                    1.   <u>First and Eighth Claims Re: Consent</u>

11                In their first claim, the minor children bring a § 1983

12  claim against Lopez and Solla based on alleged violations of

13  their Fourth Amendment rights when Lopez and Solla interviewed

14  them on December 19, 2008, without the consent of a parent or

15  guardian.[2]  In their eighth claim for relief, plaintiffs contend

16  Christian violated plaintiffs' Fourth Amendment rights when she

17  entered the Olvera/DeRose home on January 6, 2009, without

18  consent.

19                Defendants seek summary judgment on the first and

20  eighth claims solely on the ground that, because DeRose consented

21  to the interviews of the minor children on December 19, 2008, and

22  ────────────

23      [2]     Neither party articulates the theory under which the
     interviews implicated the minor children's Fourth Amendment
24  rights and therefore the court assumes, for purposes of this
     motion alone, that the minor children have a cognizable Fourth
25  Amendment claim based on the December 19, 2008, interviews. <u>Cf.</u>
     <u>Greene v. Camreta</u>, 588 F.3d 1011, 1030 (9th Cir. 2009)
26  ("[A]pplying the traditional Fourth Amendment requirements, the
     decision <u>to seize and interrogate</u> [a minor child] in the absence
27  of a warrant, a court order, exigent circumstances, or parental
     consent was unconstitutional."), <u>vacated after case determined to</u>
28  <u>be moot by</u>, <u>Camreta v. Greene</u>, 131 S.Ct. 2020, 2035 (2011)
     (emphasis added).

consented to Christian's entry on January 6, 2009, the interviews
and entry comported with the Fourth Amendment.  "[T]he question
whether a consent to a search was in fact 'voluntary' or was the
product of duress or coercion, express or implied, is a question
of fact to be determined from the totality of all the
circumstances."  Schneckloth v. Bustamonte, 412 U.S. 218, 227
(1973); see also United States v. Drayton, 536 U.S. 194, 206-07
(2002) ("The Court has rejected in specific terms the suggestion
that police officers must always inform citizens of their right
to refuse when seeking permission to conduct a warrantless
consent search. . . . Instead, the Court has repeated that the
totality of the circumstances must control, without giving extra
weight to the absence of this type of warning.").

> a.   December 19, 2008, Interviews

To conduct the interviews at issue, Lopez and Solla
went to the Olvera/DeRose home the evening of December 19, 2008,
with a third social worker, Nikkita Moorer, and two police
officers, Taizo Takahasi and Christopher Lemus.  In her
deposition, DeRose explained that she objected to the interviews
of the children:

> Ms. Lopez very forcefully said that the kids were going
> to be interviewed and that she didn't need to explain to
> me what was going on.  And obviously when police show up,
> I mean I'm familiar enough with the system that I got the
> point that they were probably going to try to detain my
> kids.  So I was then saying, "No, you're not going to
> interview my kids." . . . I told them no.  It was
> alarming to see that many people on my doorstep.  I told
> them no, I don't want you to interview the kids.  And
> pressure, pressure, pressure by them.  And then there was
> at some point a threat that "We'll take them to the
> receiving home and interview them."  And I said, "Okay.
> Interview them, but I want to be present."  "No, can't do
> that."  "Okay.  Interview them, but I want to record."
> "No, can't do that."

11

1   (DeRose Dep. 201:11-202:9.)

2          Two days after the interviews at issue, DeRose also

3   sent a four-page email to the director of DHHS, Lynn Frank,

4   raising concerns about the interviews:

5          Within hours, several child abuse investigators and
           police officers arrived on our door step.  Ms. Lopez
6          demanded to interview every child in the house . . . .
           While I understood the need for further substantiation of
7          information provided by my son, I was not enthusiastic to
           have further interviews occur in the absence of an
8          attorney or advocate.  I asked Ms. Lopez to wait for the
           arrival of our attorney.  She refused.  I asked her if
9          the interviews could be recorded.  She refused.  I told
           her why I was uncomfortable and she responded with "you
10         have no choice."

11   (Powell Decl. Ex. JJ (Docket No. 146-9).)

12         On the other hand, Lopez testified in her deposition

13   that DeRose stated that she was expecting her when they arrived

14   and said it would be "fine" for Solla and Moorer to begin

15   interviewing the children while Lopez talked with DeRose.  (Lopez

16   Decl. ¶¶ 7-10.)  Lopez recalled declining DeRose's request to

17   record Lopez and DeRose's conversation, but does not recall

18   DeRose requesting that an attorney be present.  (Id. ¶¶ 11-12.)

19         Although Solla did not have a detailed recollection of

20   conversations between Lopez and DeRose about interviewing the

21   children, she testified that she "think[s] [they] asked if we

22   could interview them," recalls it being "pretty easy," and does

23   not recall Lopez threatening to take the children or DeRose

24   requesting that an attorney be present or the interviews be

25   recorded.  (Solla Dep. 83:3-6, 91:5-95:22.)  Officer Lemus

26   testified only that it is his practice to request permission to

27   speak to a child alone, (Lemus Dep. 18:6-15), and Moorer and

28   Officer Takahashi could not recall whether DeRose objected to the

                                    12

1  interviews.  (Moorer Dep. 53:1-24; Takahashi Dep. 22:2-15.)

2          The parties' accounts of what occurred leading up to

3  the interviews differ drastically.  At summary judgment, the

4  court must construe the facts in the light most favorable to

5  plaintiffs and cannot displace the roll of the jury by

6  determining which version is more credible.  See Anderson, 477

7  U.S. at 255.  Taking DeRose's account, as depicted through her

8  deposition testimony and email to the DHHS director only two days

9  after the event, the court cannot find, as a matter of law, that

10 DeRose consented to the interviews of the children.[3]  Not only did

11 three social workers arrive at DeRose's home on the evening of

12 December 19, 2008, but two police officers also accompanied the

13 social workers.  DeRose testified that, given the presence of the

14 police officers, she thought the children would be taken.  After

15 DeRose repeatedly objected to the interviews of the children, she

16 was told that the children would be taken to the receiving home

17 and interviewed there.  To avoid having the children removed,

18 DeRose "agreed" to the interviews under certain conditions, which

19 Lopez rejected.

20         While DeRose ultimately may have "agreed" to the

21 interviews, a reasonable jury could find that she did so only

22 under the threat that the children would be taken if she did not.

23 The Supreme Court has explained that the Fourth and Fourteenth

24 Amendments "require that a consent not be coerced, by explicit or

25 implicit means, by implied threat or covert force.  For, no

26 _____

27        [3]    Because neither party addresses the issue, the court
   assumes for purposes of this motion that DeRose had legal
28 authority to consent to the interviews of CHD-O, AGD-O, and AND-
   O.

1  matter how subtly the coercion was applied, the resulting

2  'consent' would be no more than a pretext for the unjustified

3  police intrusion against which the Fourth Amendment is directed."

4  Schneckloth, 412 U.S. at 228; see also United States v. Winsor,

5  846 F.2d 1569, 1573 n.3 (9th Cir. 1988) ("As this court has

6  recognized in the situation where police demand entrance to a

7  dwelling, compliance with a [governmental] demand is not

8  consent." (internal quotation marks omitted) (alteration in

9  original)).

10       Accordingly, because a genuine issue of material fact

11  remains with respect to whether DeRose consented to the

12  interviews of the minor children, the court will deny defendants'

13  motion for summary judgment on the minor children's first claim

14  under § 1983 for alleged violations of their Fourth Amendment

15  rights.

16              b.   January 6, 2009, Entry by Christian

17       Similar to the interviews on December 19, 2008, the

18  parties' accounts of what occurred before Christian entered the

19  Olvera/DeRose home on January 6, 2009, differ in significant

20  respects.  Christian testified that, when Lopez and she arrived

21  at the Olvera/DeRose home, it was clear that DeRose was upset

22  with Lopez and Christian suggested that Lopez wait in the car

23  while she spoke with DeRose.  (Christian Dep. 82:1-13.)  She

24  further testified that DeRose "ultimately agreed to let me come

25  in the home and invited me in after I agreed to be tape-recorded

26  during our interview."  (Id. at 80:25-81:2.)  Christian denied

27  that she threatened to have the children removed if DeRose did

28  not speak with her.  (Id. at 107:2-4.)

14

On the other hand, DeRose testified at her deposition that she allowed Christian in her home under threat that the children would be removed if she did not:

```
Q:   Getting back to when Ms. Christian and Ms. Lopez
     returned to your house on January the 6th, you
     ultimately relented and you let Wendy Christian
     come into your home, did you not? . . .
A:   I did.
Q:   And you did that upon the condition that she allow
     you to tape-record her; correct?
A:   No. . . .
Q:   She refused to allow you to tape-record her?
A:   Yes. . . .
Q:   Okay.  What was the reason that you finally agreed
     to let her in the house?
A:   Because there again was a reference that we can --
     "If you don't cooperate, we can take the kids to
     the receiving home, we can take the kids."  There
     was always these references of . . . .
```

(DeRose Dep. 235:24-236:23.)

Defendants do not dispute that, if DeRose's testimony is believed, a jury could find that she did not consent to the entry of her home.  Instead, defendants argue that DeRose's prior sworn testimony during the juvenile court proceedings "calls into question" her deposition testimony and "removes any question as to whether or not [she] consented" to Christian's entry of the home.  (Cnty.'s Reply at 33:10-34:15.)  Specifically, during the juvenile court proceedings on February 18, 2009, DeRose provided the following testimony while under oath:

```
Q:   The second time that Child Protective Services came
     to the house approximately when was that in
     relation to the first visit?
A:   A month, a month-ish, maybe three weeks later. . .
     .
Q:   Okay.  What happened after the social worker
     explained the purpose of the visit to you?
A:   I told her that I didn't feel comfortable with
     [Lopez] coming in my home, that Miss Christian was
     welcomed to come in.
```

15

1  (O'Dea Decl. Ex. I at 224:22-225:23.)  In arguing that this

2  evidence is sufficient for the court to grant summary judgment,

3  defendants misconstrue the court's role at summary judgment.

4  Although the prior testimony may significantly undermine the

5  credibility of DeRose's deposition testimony, the court cannot

6  displace the role of the jury and assess DeRose's credibility.

7  See Anderson, 477 U.S. at 255 ("Credibility determinations, the

8  weighing of the evidence, and the drawing of legitimate

9  inferences from the facts are jury functions, not those of a

10  judge . . . ruling on a motion for summary judgment . . . .").

11  DeRose's deposition testimony is sufficient to create a triable

12  issue of fact that she did not voluntarily consent to Christian

13  entering her home.

14      Accordingly, the court must deny defendants' motion for

15  summary judgment on the eighth claim for a violation of the

16  Fourth Amendment as to Christian.  Because the parties treat the

17  claim as against only Christian and only Christian entered the

18  home, the court will grant defendants' motion for summary

19  judgment as to all remaining defendants on that claim.

20          2.   Third and Fourth Claims for Violations of the

21               Fourteenth Amendment Rights to Familial

22               Association

23          a.   Olvera and DeRose's Rights to Familial

24               Association

25      In their third and fourth claims, Olvera and DeRose

26  assert that particular defendants violated their Fourteenth

27  Amendment rights to familial association based on CHD-O's removal

28  on February 5, 2009, and continued detention for fourteen days

following the removal.  Olvera and DeRose claim that their rights
to familial association derive from their status as "de facto
parents" or "prospective adoptive parents" of CHD-O under
California law.

"[F]reedom of personal choice in matters of . . .
family life is one of the liberties protected by the Due Process
Clause of the Fourteenth Amendment." <u>Cleveland Bd. of Educ. v.
LaFleur</u>, 414 U.S. 632, 639-640 (1974).  "There does exist a
'private realm of family life which the state cannot enter,' that
has been afforded both substantive and procedural protection."
<u>Smith v. Org. of Foster Families For Equality & Reform</u>, 431 U.S.
816, 842 (1977) (internal citation omitted).  Traditionally,
these rights have extended to only biological parents.  <u>See</u> <u>id.</u>
at 843-44 ("[T]he usual understanding of 'family' implies
biological relationships, and most decisions treating the
relation between parent and child have stressed this element. . .
. [But n]o one would seriously dispute that a deeply loving and
interdependent relationship between an adult and a child in his
or her care may exist even in the absence of blood
relationship.").

"[T]here is no question that *parents* have a
constitutionally protected liberty interest in making decisions
about the care, custody, and control of their children." <u>Miller
v. California</u>, 355 F.3d 1172, 1175 (9th Cir. 2004).  "The
constitutional right of parents and children to live together
without governmental interference is well established [and t]he
Fourteenth Amendment guarantees that parents will not be
separated from their children without due process of law except

in emergencies." Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs., 237 F.3d 1101, 1107 (9th Cir. 2001). "Where procedural due process must be afforded because a 'liberty' or 'property' interest is within the Fourteenth Amendment's protection, there must be determined 'what process is due' in the particular context." Smith, 431 U.S. at 847.

With parents, "the liberty interest in family privacy has its source, and its contours are ordinarily to be sought, not in state law, but in intrinsic human rights, as they have been understood in 'this Nation's history and tradition.'" Id. at 845. Unlike those intrinsic rights and similar to foster parents, any rights Olvera and DeRose assert as de facto parents or prospective adoptive parents derive entirely from state law. "While the Court has recognized that liberty interests may in some cases arise from positive-law sources, in such a case . . . it is appropriate to ascertain from state law the expectations and entitlements of the parties." Id. at 845-46 (internal citation omitted). While the court must look to state law to determine "the expectations and entitlements of the parties," id. at 846, the question of whether any liberty interest created by state law is protected under the federal Due Process Clause is a question of federal law. See Town of Castle Rock v. Gonzales, 545 U.S. 748, 757 (2005) ("Although the underlying substantive interest is created by an independent source such as state law, *federal constitutional law* determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause." (internal quotation marks and citations omitted)).

1                    1.  <u>De Facto Parents</u>

2           California Rules of Court provide that a "de facto

3  parent" is "'a person who has been found by the court to have

4  assumed, on a day-to-day basis, the role of parent, fulfilling

5  both the child's physical and psychological needs for care and

6  affection, and who has assumed that role for a substantial

7  period.'"  <u>In re Patricia L.</u>, 9 Cal. App. 4th 61, 66 (4th Dist.

8  1992) (quoting Cal. Rules of Court 1401(a)(4)).  "The concept of

9  a de facto parent was judicially created to recognize limited

10 rights in dependency cases for a person who has been found by the

11 juvenile court to have assumed on a day-to-day basis the role of

12 a parent, fulfilling the child's physical and psychological needs

13 for a substantial period of time."  <u>R.H. v. Superior Court</u>, 209

14 Cal. App. 4th 364, 371 (4th Dist. 2012).  The purpose of de facto

15 parent status is to enable "very important persons in the minor's

16 life" to assert their interests in the "companionship, care,

17 custody and management of the child" during a dependency

18 proceeding and provide the court with "critical information

19 relating to the child's best interests."  <u>In re Patricia L.</u>, 9

20 Cal. App. 4th at 66 (internal quotation marks and citation

21 omitted).  "A person seeking de facto parent status must file a

22 written application and establish by a preponderance of the

23 evidence that he or she falls within the definition of a de facto

24 parent."  <u>Id.</u> at 67.

25           Here, Olvera and DeRose concede that they were not

26 designated de facto parents by a juvenile court, but nonetheless

27 argue that, "in every relevant sense," that is what they were.

28 (Pls.' Opp'n to Cnty.'s Mot. at 90 n.49.)  Plaintiffs have not

cited any authority, however, for treating them as de facto parents under California law in the absence of having sought and received that status by a juvenile court.  Even assuming a juvenile court could have granted Olvera and DeRose de facto parents status, a de facto parent's rights under California law "are not equated" with the rights of parents and are limited to being present, having retained or appointed counsel, and presenting evidence in a dependency proceeding.  R.H., 209 Cal. App. 4th at 371-72 (internal quotation marks and citation omitted); see also In re Kieshia E., 6 Cal. 4th 68, 76 (1993) ("Within its limited scope, the doctrine of de facto parenthood has since been liberally applied to ensure that all legitimate views, evidence, and interests are considered in dispositional proceedings involving a dependent minor." (emphasis added)); In re Joshuia S., 205 Cal. App. 3d 119, 122 (4th Dist. 1988) ("[T]he mother is placing too much significance in the status of de facto parent.  The granting of such status does not automatically confer custody of the minor dependent child on persons recognized as de facto parents . . . .").

In Miller, grandparents, who had been granted de facto parent status by the juvenile court, argued that they had a substantive due process right to family integrity under the Fourteenth Amendment because "they had assumed the role of parents to their grandchildren by providing for their care, comfort, and protection as well as their physical and psychological needs for a substantial period of time." Miller, 355 F.3d at 1175.  The Ninth Circuit rejected the grandparents' claim that their status as de facto parents "under California law

20

1  for purposes of the juvenile court proceedings create[d] a

2  liberty interest in contact with the children." Id. at 1176.

3  After recognizing the limited rights de facto parent status

4  provides during dependency proceedings, the court concluded,

5  "being de facto parents simply gave the [grandparents] the right

6  to appear in the proceeding . . . . It conferred no other, or

7  weightier interest of constitutional dimension." Id.

8        Accordingly, because de facto parent status is

9  insufficient to give rise to a liberty interest cognizable under

10 the Fourteenth Amendment, Olvera and DeRose's reliance on their

11 status as being akin to de facto parents is unavailing.

12 Moreover, even if a relationship akin to de facto parents could

13 give rise to a liberty interest under the facts of this case,

14 plaintiffs have not shown that any such right was clearly

15 established at the time CHD-O was removed and detained, thus

16 defendants would be entitled to qualified immunity under such a

17 theory.

18              2.   Prospective Adoptive Parents

19       Olvera and DeRose next contend that they had a liberty

20 interest in their continued companionship with CHD-O as

21 prospective adoptive parents under California law.  On December

22 22, 2008, Olvera filed an Adoption Request form and Parental

23 Consent to Adoption form with the Del Norte County Superior

24 Court.  (O'Dea Decl. Ex. B; Olvera Dep. 321:5-23.)  The Adoption

25 Request Form checked box 16, which states, "I will ask the court

26 to end the parents rights of [blank]," but does not identify

27 Morrison, Miess, or any individuals in the blank area provided.

28 (O'Dea Decl. Ex. B.)  The Parental Consent to Adoption form was

also completed erroneously in that it states, "I/we, being the parents of [CHD-O] . . . give my/our full and free consent to the adoption of said child by Susan E. Morrison and Kelly B. Miess." (Id. Ex. A.)

It is undisputed that the Adoption Request form was also incomplete because it did not attach a copy of an Independent Adoption Placement Agreement as provided for in the Adoption Request form. (See id. Ex. A at 2 (indicating that a copy of the Independent Adoption Placement Agreement is attached to the form and was signed by all persons with parental rights); Olvera Dep. 322:3-324:9.) Olvera testified that Morrison and Miess had not signed an Adoption Placement Agreement before February 5, 2009. (Olvera Dep. 250:5-8.)

Under California law, a child must be "placed for adoption" prior to the filing of an adoption request. See Cal. Fam. Code § 8802. Completion of an Independent Adoption Placement Agreement was necessary in order for CHD-O to have been "placed" with Olvera and DeRose for adoption under California law. Specifically, Family Code section 8539 provides,

> "Place for adoption" means, in the case of an independent adoption, the selection of a prospective adoptive parent or parents for a child by the birth parent or parents and the completion of an adoptive placement agreement on a form prescribed by the department by the birth parent or parents placing the child with prospective adoptive parents.

Cal. Fam. Code § 8539 (emphasis added); see also Cal. Fam. Code § 8801.3 (detailing additional requirements before a child can be "considered to have been placed for adoption").

Olvera and DeRose's incomplete Adoption Request filed in Del Norte County for the adoption of CHD-O was never

22

finalized.  (Olvera Dep. 246:7-247:1.)  Instead, a new Adoption
Request was filed in Sacramento County Superior Court on August
20, 2009.  (O'Dea Decl. Ex. C.)  In connection with that
adoption, Morrison and Miess executed an Independent Adoption
Placement Agreement on September 18, 2009.  (DeRose Dep. 297:9-
12.)  On May 24, 2010, the Sacramento County Superior Court
issued an Adoption Order granting the independent adoption of
CHD-O by Olvera and DeRose.  (O'Dea Decl. Ex. D.)

Relying on Jinny N. v. Superior Court, 195 Cal. App. 3d
967 (4th Dist. 1987), plaintiffs argue that the absence of the
Independent Adoption Placement Agreement does not preclude a
finding that CHD-O was "placed" with Olvera and DeRose for
adoption.  In Jinny N., the Orange County Social Services Agency
had placed a child with Jinny N. as a foster child, but then
"directly asked Jinny N. to apply to adopt the child" and
"repeatedly wrote Jinny N. directly or through counsel, urging
and offering to help complete adoption."  Jinny N., 195 Cal. App.
3d at 972.  Because the agency had "verifiably solicit[ed],
nurture[d], and confirm[ed] an adoptive placement," the appellate
court rejected the trial court's finding that the "signing [of] a
formal adoptive placement agreement is prerequisite to becoming a
prospective adoptive parent."  Id. at 970-71, 973.

The reasoning of Jinny N., however, has little
application to the case at hand.  First, the case arose within
the context of an agency adoption in which the agency had already
placed the child with Jinny N. as a foster parent.  The court
recognized the difficulty in drawing the line between the moment
a foster placement can "metamorphose" into an adoptive placement.

23

1   Id. at 972-73.  Second, in determining when this "metamorphose"

2   might have occurred, the court explained, "[t]he intent of the

3   parties must surely be evaluated, along with the objective

4   indicia of adoption proceedings."  Id. at 972.  Even assuming

5   that Morrison and Miess intended to place CHD-O with Olvera and

6   DeRose, any "objective indicia of adoption proceedings" were

7   unequivocal at best.  Not only was an Independent Adoption

8   Placement Agreement lacking, but the Parental Consent to Adoption

9   form, which was the only form containing Morrison and Miess's

10  signatures, did not identify Olvera and DeRose as the prospective

11  adoptive parents of CHD-O.  Compared to the frequent

12  communications by the agency seeking to facilitate Jinny N.'s

13  agency adoption of the child, there is a paucity of objective

14  indicia of any independent adoption proceedings in the case at

15  hand.  Plaintiffs have therefore not established a disputed issue

16  of fact with respect to whether CHD-O was placed with Olvera and

17  DeRose for adoption.

18        Nonetheless, plaintiffs contend that, even without

19  considering the deficient Adoption Request and Parental Consent

20  to Adoption forms filed in Del Norte County, Olvera and DeRose

21  had prospective adoptive parent status at the time CHD-O was

22  removed under California Family Code section 8542.  Section 8542

23  provides, "'Prospective adoptive parent' means a person who has

24  filed or intends to file a petition under Part 2 (commencing with

25  Section 8600) to adopt a child who has been or who is to be

26  placed in the person's physical care . . . ."  Cal. Fam. Code §

27  8542 (emphasis added).

28        Even assuming, however, that Olvera and DeRose were

24

prospective adoptive parents under section 8542, it does not

follow that, as prospective adoptive parents under that statute,

they had a liberty interest protected by the Due Process Clause.

"The extent to which other creations of state law resembling

parental rights, such as foster parents and de facto parents,

give rise to accompanying constitutional liberty interests

depends on the contexts in which the issues are raised."

Brittain v. Hansen, 451 F.3d 982, 995 (9th Cir. 2006).

        In Adoption of Baby Girl B., 74 Cal. App. 4th 43 (4th

Dist. 1999), a California appellate court held that "it is well

established that a prospective adoptive parent with whom a child

has been placed for adoption has a liberty interest in continued

custody." Baby Girl B., 74 Cal. App. 4th at 51.  Based on this

liberty interest, the court stated that "a prospective adoptive

parent has a constitutional right to notice and 'a full hearing'

before the adoptive placement can be terminated, at least in the

absence of urgent or emergency circumstances." Id.  In that

case, however, it was undisputed that the biological mother had

executed an adoption placement agreement and that her consent to

the adoption had become irrevocable, that the prospective

adoptive parent had filed an adoption petition, that the child

had been placed with the prospective adoptive parent under the

relevant state statues, and that the Department of Social

Services had reviewed the petition.  From the court's detailed

outline of the relevant steps in the process, it is clear that

each of these occurrences necessarily led to the prospective

adoptive parents statutory right to a hearing before the

placement could be terminated.[8]

_____

[8]     The court outlined the relevant statutes and procedures that led to a statutory right to a hearing in <u>Baby Girl B.</u>:

Once the adoption placement agreement has been signed, the prospective adoptive parent may petition for adoption.  (Fam. Code, § 8802, subd. (a)(1)(C).)  The court clerk must give notice of the petition to the Department.  (Fam. Code, § 8802, subd. (a)(2).)  In addition, when the petition is filed, the petitioner must file a copy of the petition with the Department.  (Fam. Code, § 8808.)  The Department must "investigate the proposed independent adoption" (Fam. Code, § 8807, subd. (a)) and "ascertain whether the child is a proper subject for adoption and whether the proposed home is suitable for the child."  (Fam. Code, § 8806; <u>see also</u> Cal. Code Regs., tit. 22, §§ 35079, subd. (b), 35081, 35083, 35087, 35089, 35093.)  It must interview the petitioners and the birth parents.  (Fam. Code, § 8808; <u>see also</u> Cal. Code Regs., tit. 22, § 35083.)  Within 180 days after the petition is filed, the Department must "submit to the court a full report of the facts disclosed by its inquiry with a recommendation regarding the granting of the petition."  (Fam. Code, § 8807, subd. (a); <u>see also</u> Cal. Code Regs., tit. 22, §§ 35091, 35123, subd. (a).)  A copy of the report must be given to the petitioner. (Fam. Code, § 8821.)  Under the Department's own regulations, this must be done at the same time as the report is filed.  (Cal. Code Regs., tit. 22, § 35123, subd. (g).)

If the Department finds the petitioner's home is not suitable for the child, and if it recommends that the petition be denied, the clerk must refer the report to the court "for review."  (Fam. Code, § 8822, subd. (a).)  The court must set a hearing on the petition and must "give reasonable notice of the hearing" to the petitioner, the birth parents, and the Department.  (Fam. Code, § 8822, subd. (b).)

At the hearing, the Department is deemed to represent the child.  (Fam. Code, § 8822, subd. (c).)  Subject to exceptions not relevant here, the prospective adoptive parents must appear in person at the hearing.  (Fam. Code, §§ 8612, 8613, 8823.)  The court must "examine all persons appearing before it . . . . "  (Fam. Code, § 8612, subd. (a).)  If the court is satisfied that adoption will promote the interest of the child, it may enter an order of adoption.  (Fam. Code, § 8612, subd. (c).)  If, however, it "sustains the recommendation of the department . . . that the child be removed from the home of the petitioners because the department . . . recommends denial . . . or if the court dismisses the petition and does not return the child to the birth

Baby Girl B. cannot be blindly applied to this case because the context in which the prospective adoptive parent's right to procedural due process arose varies greatly from the context in which Olvera and DeRose assert rights as prospective adoptive parents.  First, not only is it undisputed that CHD-O was never placed with Olvera and DeRose before the challenged removal, nothing in the record suggests that any action was taken by the state based on the deficient Adoption Request.  Second, plaintiffs do not contend that, at the time of the removal, Olvera and DeRose were entitled to any of the statutory protections at issue in Baby Girl B.  It strains reason to conclude that, in the absence of a grant of statutory rights similar to those in Baby Girl B., that the mere language of section 8542 and Olvera, DeRose, Morrison, and Miess's future intent to take action unknown to the state could give rise to a legitimate expectation of a state entitlement sufficient to arise to a constitutional liberty interest.

In the context of a different statutory scheme, the California Fourth Appellate District recently recognized the limited statutory nature of any rights held by prospective adoptive parents.  R.H., 209 Cal. App. 4th at 364.  In R.H., the court explained that prospective adoptive parents' rights under Welfare and Institutions Code section 366.26(n) are "akin to

_____

parents, the court shall commit the child to the care of the department . . . for the department . . . to arrange adoptive placement or to make a suitable plan."  (Fam. Code, § 8805.)

Adoption of Baby Girl B., 74 Cal. App. 4th at 49-50 (omissions and citations in original).

27

1  those of de facto parents, but are even more circumscribed." _Id._

2  at 372.  After reviewing the limited statutory rights of a

3  prospective adoptive parent, the court concluded that, while they

4  "have rights under section 366.26, subdivision (n) to notice and

5  the opportunity to object and to participate in the hearing, []

6  they have <u>no fundamental liberty interest in the child</u> and no

7  statutory or due process right to appointed counsel at the

8  hearing."  _Id._ at 374-75 (emphasis added).[9]

9         Moreover, when California appellate courts have

10 concluded that prospective adoptive parents were entitled to

11 procedural due process protections before removal of the

12 prospective adoptive child from their home, the adoptions at

13 issue were agency, not independent, adoptions.  _E.g._, <u>Jinny N.</u>,

14 195 Cal. App. 3d at 971.  In an agency adoption, parental rights

15 have been terminated or the child has been relinquished to the

16 agency and the agency has custody of the child.  <u>See generally</u>

17 Cal. Fam. Code § 8704.  Here, it is undisputed that the albeit

18 insufficient and ultimately abandoned adoption in Del Norte

19 County and the subsequent and successful adoption in Sacramento

20 County were independent adoptions.  Unlike an agency adoption, an

21 "independent adoption" as is an adoption "in which neither the

22

23        [9]     Plaintiffs distinguish <u>R.H.</u> only on the ground that it
24 involved prospective adoptive parents under Welfare and
   Institutions Code section 366.26(n), not Family Code section
25 8542.  Plaintiffs overlook the fact, however, that prospective
   adoptive parents were in fact granted some statutory protections
26 in section 366.26.  Plaintiffs have not identified a single
   statutory right that arose in the context of their case based on
27 their alleged prospective adoptive parent status under section
   8542.  Surely a statute that confers some rights would be more
28 likely to give rise to a legitimate expectation of entitlement
   than one that confers no rights at all.

department, county adoption agency, nor agency licensed by the department is a party to, or joins in, the adoption petition." Id. § 8524.

For example, in C.V.C. v. Superior Court, 29 Cal. App. 3d 909 (3d Dist. 1973), addressed an agency adoption under former Civil Code section 224n (now Family Code section 8704) where the Sacramento County Department of Social Welfare had "placed" a child with plaintiffs as "prospective adoptive parents." C.V.C., 29 Cal. App. 3d at 912. Although the statute provided procedural safeguards for prospective adoptive parents only after the parents had filed an adoption petition, the court concluded that the prospective adoptive parents were entitled to notice and a hearing before removal of the child from their home even before the parents had filed the adoption petition. See Dep't of Soc. Servs. v. Superior Court, 58 Cal. App. 4th 721, 736 (3d Dist. 1997) (discussing C.V.C.). Unlike the case at hand, however, it was undisputed in C.V.C. that the plaintiffs were prospective adoptive parents under the relevant statute and that the agency had placed the child with them.

Similarly, in Spielman v. Hildebrand, 873 F.2d 1377 (10th Cir. 1989), the Tenth Circuit held that preadoptive parents "may have [had] . . . a reasonable expectation of developing a permanent relationship with the child that rises to a liberty interest meriting limited due process protection." Spielman, 873 F.2d at 1385. In that case, however, the rights of the natural parents had been terminated, the state had placed the children with the preadoptive parents and executed a written preadoption agreement that restricted the state Department of Social and

29

1  Rehabilitation Services's ("SRS") right to remove the children,
2  and the SRS had encouraged the plaintiffs to treat the children
3  as their own.  Id. at 1384-85.  The Tenth Circuit thus expressly
4  relied on the "preadoption agreement, coupled with the SRS
5  representations at the time the children were placed" with the
6  preadoptive parents to conclude that the preadoptive parents may
7  have a liberty interest sufficient to merit the protections of
8  the Procedural Due Process Clause.  Id. at 1385.

9          Plaintiffs have not identified any action by the state
10  or conferral of statutory rights similar to that in C.V.C. or
11  Spielman that could give rise a legitimate expectation cognizable
12  under the Due Process Clause.  At a minimum, Olvera and DeRose's
13  status as prospective adoptive parents and any such resulting
14  liberty interest under the Due Process Clause was far from
15  clearly established and defendants would thus be entitled to
16  qualified immunity in the event that Olvera and DeRose were
17  prospective adoptive parents and had a resulting liberty
18  interest.

19          Accordingly, because Olvera and DeRose have not
20  established that they had rights to familial association under
21  the Fourteenth Amendment in relation to CHD-O, let alone that
22  those rights were clearly established, the court must grant
23  defendants' motion for summary judgement on Olvera and DeRose's
24  third and fourth claims for relief.

25                  b.    Morrison and Miess's Rights to Familial
26                        Association

27          It is undisputed that, at the time CHD-O was taken into
28  protective custody, Morrison and Miess were his adoptive parents.

30

1   It is also undisputed that Morisson and Miess had signed a

2   guardianship agreement with Olvera and DeRose on October 22,

3   2007, that gave Olvera and DeRose temporary guardianship over

4   CHD-O. (Miess Dep. 75:11-14, 76:7-77:3.)  At the time CHD-O was

5   removed and taken into protective custody, he had been living

6   exclusively in the Olvera/DeRose home for approximately two

7   years.  Based on these circumstances, defendants claim that they

8   are entitled to qualified immunity on Morrison and Miess's third

9   and fourth claims because it was not clearly established at the

10  time CHD-O was removed that his removal would violate Morrison

11  and Miess's rights to familial association.

12          Nine months after CHD-O was removed from the

13  Olvera/DeRose home, the Ninth Circuit decided Burke v. County of

14  Alameda, 586 F.3d 725 (9th Cir. 2009).  In that case, a police

15  officer had taken a child into protective custody without a

16  warrant based on his determination that the child was in imminent

17  danger.  At the time the child was taken into custody, the

18  child's mother and father had joint legal custody of the child,

19  but the child lived with her mother and step-father and the

20  mother had sole physical custody.  The mother and father brought

21  § 1983 claims under the Procedural Due Process Clause based on

22  the removal of their child without prior judicial authorization

23  or reasonable cause to believe the child was in imminent danger.

24  The parent's claim was based on the Ninth Circuit's prior holding

25  in Wallis v. Spencer, 202 F.3d 1126 (9th Cir. 2000), that

26          "[o]fficials may remove a child from the custody of its
            parent without prior judicial authorization only if the
27          information they possess at the time of the seizure is
            such as provides reasonable cause to believe that the
28          child is in imminent danger of serious bodily injury and

31

1    that the scope of the intrusion is reasonably necessary
2    to avert that specific injury."

3  Burke, 586 F.3d at 731 (quoting Wallis, 202 F.3d at 1138)
4  (alteration in original).[10]

5        With respect to the father's claim, the Ninth Circuit
6  recognized that "non-custodial parents have a reduced liberty
7  interest in the companionship, care, custody, and management of
8  their children," id. at 733, and that the "interest is
9  unambiguously lesser in magnitude than that of a parent with full
10 legal custody," id. (internal quotation marks and citation
11 omitted).  Noting that the court was presented with "a question
12 of first impression," it held that, even if the father's interest
13 in his daughter's "companionship was somehow reduced, he was not
14 without any interest in the custody and management of [his
15 daughter]" and extended the limitation on removal of a child
16 without a warrant or imminent danger "to parents with legal
17 custody, regardless of whether they also possess physical custody
18 of their children."  Id.

19       The court ultimately concluded that the officer was
20 entitled to qualified immunity because its holding that the
21 limitation on removal extended to parents with legal custody even
22 in the absence of physical custody was not clearly established
23 before its decision in Burke.  Id. at 734; accord Schwenk v.
24 County Of Alameda, 364 Fed. App'x 336, 337 (9th Cir. 2010).  The

25

26       [10]   Plaintiffs argue that Burke is not relevant to this
   case because it dealt with removal without a warrant and, here,
27 CHD-O was removed pursuant to a protective custody warrant.
   However, plaintiffs contend that the PCW was obtained through
28 judicial misrepresentation and thus could not justify CHD-O's
   removal.

1    court explained that "Wallis referred only to the removal of a

2    child from 'the custody of its parent,'" that the court had

3    "never defined the type of custody," and that "custody is

4    commonly thought of referring only to 'physical' custody." Id.

5         Here, the PCW states, and plaintiffs do not dispute,

6    that Lopez contacted Morrison and Miess about CHD-O prior to

7    obtaining the PCW.  The PCW indicates that Morrison and Miess had

8    "temporarily placed the child . . . in the home of" Olvera and

9    DeRose on April 8, 2007, "due to their inability to care for the

10   child."  (Powell Decl. Ex. S ("PCW") at 4.)  After Miess

11   initially refused to talk to Lopez before talking to Olvera and

12   DeRose, Morrison contacted Lopez and indicated that both Morrison

13   and Miess consented to Olvera and DeRose's adoption of CHD-O,

14   that she was "'not interested in talking'" to Lopez any further

15   about the case, and that "any questions could be referred to the

16   attorney for" Olvera and DeRose.  (Id. at 4-5.)

17        Based on this information, a social worker would be

18   reasonable in believing that Olvera and DeRose had physical

19   custody of CHD-O and that Morrison and Miess did not intend to

20   regain physical custody of him.  Moreover, even under Burke's

21   extension of Wallis to "parents with legal custody, regardless of

22   whether they also possess physical custody," Lopez's contact of

23   Morrison and Miess was likely sufficient to comport with their

24   rights of familial association.

25        In Burke, the Ninth Circuit did not indicate that the

26   father's rights to familial association necessitated that the

27   officer transfer physical custody of the child to the father.

28   Instead, the court indicated only that, against the current legal

1  backdrop, "we cannot say that <u>failing to contact</u> [the father],

2  who did not have physical custody of [the child], was clearly

3  unlawful."  <u>Burke</u>, 586 F.3d at 734 (emphasis added).  The court

4  further noted:

5        [T]he test in <u>Wallis</u> is flexible and must take into
       account the individual circumstances.  For example, if
6        the parent without physical custody does not reside
       nearby, and a child is in imminent danger of harm, it is
7        probably reasonable for a police officer to place a child
       in protective custody without attempting to place the
8        child with the geographically distant parent.

9  <u>Id.</u> at 733.  Since <u>Burke</u>, the Ninth Circuit has also treated the

10 requirement as one to "contact" a non-custodial guardian:

11       [Defendants] were entitled to qualified immunity even
       though they failed to contact [the non-custodial
12       guardian] before they placed [the children] in protective
       custody.  It was not clearly established as of April 26,
13       2006, that <u>officials must contact</u> a child's second legal
       guardian before they place the child in protective
14       custody when that guardian lives with another guardian,
       who the officials reasonably suspect is abusing the
15       child.

16 <u>Barnes v. County of Placer</u>, 386 Fed. App'x 633, 636 (9th Cir.

17 2010) (emphasis added).

18       As previously discussed, it is undisputed that Lopez

19 contacted Morrison and Miess prior to submitting the PCW and that

20 they indicated that they consented to Olvera and DeRose's

21 adoption of CHD-O and did not wish to speak with Lopez further.

22 It is also undisputed that, at the time of CHD-O's removal,

23 Morrison and Miess lived in Wisconsin.  Given this information,

24 it is likely that Lopez's communications with Morrison and Miess

25 would have been sufficient under <u>Wallis</u> and <u>Burke</u>.  At the very

26 least, it was not "beyond debate," <u>Reichle</u>, 132 S.Ct. at 2093, at

27 the time of CHD-O's removal that taking him into protective

28 custody violated Morisson and Miess's rights to familial

                                34

1    association and defendants are therefore entitled to qualified

2    immunity on Morrison and Miess's third and fourth claims.

3    Accordingly, the court must grant defendants' motion for summary

4    judgment on Morrison and Miess's third and fourth claims under §

5    1983 for violations of their Fourteenth Amendment rights to

6    familial association.

7                    c.    Minor Children Plaintiffs' Rights to

8                          Familial Association

9              RD-O, SD-O, GD-O, AGD-O, AND-O, and COD-O, who were

10   living in the Olvera/DeRose home at the time of CHD-O's removal,

11   also seek recovery under the third and fourth claims based on the

12   removal and continued detention of CHD-O.  Relying only vaguely

13   on the "emotional attachments" between siblings, plaintiffs do

14   not cite a single case in support of their theory that siblings

15   have a liberty interest protected by the Due Process Clause.  In

16   fact, the Ninth Circuit has expressly rejected such a claim,

17   explaining that, Supreme Court precedent does not "support[] an

18   interest for siblings consonant with that recognized for parents

19   and children." Ward v. City of San Jose, 967 F.2d 280, 284 (9th

20   Cir. 1991); accord Rentz v. Spokane County, 438 F. Supp. 2d 1252,

21   1265 (E.D. Wash. 2006) ("The Ninth Circuit has held that a

22   sibling does not possess a constitutionally protected liberty

23   interest in the companionship of another sibling.").

24             Moreover, as CHD-O was not even adopted by Olvera and

25   DeRose at the time of his removal from the home, plaintiffs fail

26   to address how the other children in the home had a cognizable

27   liberty interest in his continued residence at the home.  Unlike

28   with Olvera and DeRose, where plaintiffs at least rely on

                                    35

1   purported rights under state law as de facto parents or
2   prospective adoptive parents, plaintiffs have not advanced any
3   such theory with respect to the minor children plaintiffs.
4   Accordingly, plaintiffs have failed to advance a plausible
5   theory, let alone establish the genuine issue of material fact
6   for trial, that the minor  children plaintiffs have a cognizable
7   liberty interest under the Due Process Clause that was violated
8   when CHD-O was removed from the Olvera/DeRose home.  Accordingly,
9   the court must grant defendants' motion for summary judgment on
10  the minor children plaintiffs' third and fourth claims under §
11  1983 for violations of their Fourteenth Amendment rights.

12              3.    CHD-O's Second Claim for Violation of the Fourth
13                    Amendment

14                    a.    Requisite Personal Participation

15              Although the second claim is asserted against all
16  defendants, plaintiffs claim there is a disputed issue of
17  material fact as to the participation of only Lopez, Schrage,
18  Cullivan, Jones, Travis, and Guillon.  It is undisputed that
19  Lopez drafted the PCW and Travis and Guillon do not dispute that
20  they sufficiently participated in drafting or editing the PCW.
21  Thus, the only issue is whether a genuine issue of material fact
22  remains with respect to whether Schrage, Cullivan, and Jones
23  sufficiently participated in drafting or editing the PCW so as to
24  render them proper defendants to CHD-O's claim for a violation of
25  his Fourth Amendment right.

26              "Liability under section 1983 arises only upon a
27  showing of personal participation by the defendant."  Taylor v.
28  List, 880 F.2d 1040, 1045 (9th Cir. 1989).  "'[I]ntegral

participation' [is required] by each officer as a predicate to liability," but "'integral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation." <u>Boyd v. Benton County</u>, 374 F.3d 773, 780 (9th Cir. 2004).

During her deposition, Lopez testified that, as Lopez's supervisor, Schrage was involved in editing the PCW:

> Q:   Okay.  Are you aware of Eva Schrage making any
>      edits to your warrant application?
> A:   Yes.
> Q:   Okay.  Which ones do you remember?
> A:   It was edited at length, and some of the statements
>      were made more concise.  What I recall doing with
>      my initial warrant was I basically gave a full
>      narrative of the case from beginning to end.  And
>      it was very substantial in length.  And it was
>      edited because at the time the court had requested
>      that the Department keep all protective custody
>      warrants under a specific length.  Because of the
>      amount of warrants they were reviewing, they
>      wouldn't have say enough time to read a, you know,
>      15 -- 20-page warrant application. . . . With this
>      case it was difficult for me to that, and so a
>      large part of the editing on what to include and
>      what not to include was -- was based on the
>      advisements of my superiors.

(Lopez Dep. 378:17-379:12; <u>see also</u> Lopez Dep. 422:16-423:3 (indicating that she believes she expressed concern to Schrage about information that had been edited out of the PCW).) Although Schrage denied that she read the PCW, (<u>see</u> Schrage Dep. 123:8-11), she attended the staffing meeting on January 22, 2009, (<u>id.</u> at 107:9-108:3).  Her participation in the staffing and Lopez's testimony is sufficient to create a triable issue of fact with respect to whether she was an integral participant in drafting the PCW so as to hold her liable under § 1983.  At trial, plaintiffs must ultimately prove that Schrage was an

integral participant in drafting or editing the PCW as it relates

to the misrepresentations that could give rise to a cognizable

Fourth Amendment violation.

With respect to Cullivan and Jones, who were part of

the Court Services unit of CPS, the only testimony plaintiffs

cite regarding their involvement in preparing the PCW was

equivocal testimony from Lopez that one of them explained that

information deleted from the PCW could be expanded upon in

further reports to the court:

> A:   I believe I had concerns regarding the editing out
>      of -- there were certain statements that were made
>      that were found to be I guess not relevant that I
>      felt were relevant because I was told the
>      information would be expanded upon in further court
>      reports. . . .
> Q:   And the person who said expanded, you gave me that
>      name?  Would be expanded upon later as -- that
>      wasn't the attorneys; right?  That was --
> A:   I believe I stated it was either County counsel or
>      Court Services that had told me to -- to kind of. .
>      . .
> Q:   But the Court Services, does that got -- did that
>      have a name associated with it?
> A:   I'm not sure if it was Jennifer Cullivan.
> Q:   Or Jones; right?
> A:   Or Jones.  I'm not -- I remember having more
>      contact with Ms. Cullivan than with Bryan Jones.

(Lopez Dep. 423:8-424:3.)  Not only is this testimony equivocal

as to whether it was Cullivan or Jones that might have told Lopez

that the information could be expanded on in subsequent

submissions to the court, it does not, without more, create a

genuine issue of material fact that Cullivan or Jones was an

integral participant in drafting the content of the PCW or even

had knowledge as to the content of the PCW, let alone any

1  material misrepresentations.[11]

2         Accordingly, because plaintiffs have established a

3  triable issue of fact that only Lopez, Schrage, Travis, and

4  Guillon sufficiently participated in the drafting and editing of

5  the PCW to give rise to liability under § 1983, the court will

6  grant defendants' motion for summary judgment on CHD-O's second

7  claim as to all defendants except Lopez, Schrage, Travis, and

8  Guillon.

9              b.   Qualified Immunity / Judicial Deception

10        In relevant part, California Welfare and Institutions

11 Code section 340 provides, "Whenever a petition has been filed in

12 the juvenile court alleging that a minor comes within Section 300

13 and praying for a hearing thereon, . . . and it appears to the

14 court that the circumstances of his or her home environment may

15 endanger the health, person, or welfare of the minor . . . a

16 protective custody warrant may be issued immediately for the

17 minor."  The issuance of the warrant to place CHD-O in protective

18 custody must therefore have been supported by probable cause that

19 the circumstances in the Olvera/DeRose home endangered CHD-O's

20 health or welfare.  "[P]robable cause exists where under the

21 totality of the circumstances known to the officer, a prudent

22 person would have concluded that there was a fair probability

23 that the suspect had committed or was committing a crime."

24 _____

25        [11]  Plaintiffs submitted a copy of a subsequent detention
26 report, which Cullivan and Jones signed.  (Powell Decl. Ex. W.)
   At oral argument, however, plaintiffs clarified that their claim
27 based on any statements in the detention report that allegedly
   caused CHD-O's continued detention is limited to the fourth
28 claim, which raises the rights of familial association and is
   asserted by all plaintiffs except CHD-O.

1  United States v. Noster, 590 F.3d 624, 629–30 (9th Cir. 2009).

2  Plaintiffs contend that the seizure of CHD-O on February 9, 2009,

3  was unconstitutional because the warrant for protective custody

4  of CHD-O was obtained through fraud and deceit by omitting

5  material information from the PCW.

6        Lopez and Schrage contend they are entitled to

7  qualified immunity on CHD-O's claim based on alleged judicial

8  deception in obtaining the warrant for protective custody of CHD-

9  O.  When addressing § 1983 claims based on judicial deception,

10 the standard for qualified immunity is governed by Franks v.

11 Delaware, 438 U.S. 154 (1978).  Liston v. County of Riverside,

12 120 F.3d 965, 972 (9th Cir. 1997); see also Liston, 120 F.3d at

13 972 ("The Franks standard, although developed in a criminal

14 context, also defines the scope of qualified immunity in civil

15 rights actions.  Franks established a criminal defendant's right

16 to an evidentiary hearing when he made a showing of deliberate or

17 reckless disregard for the truth in a search warrant affidavit

18 and demonstrated that but for the dishonesty, the affidavit would

19 not support a finding of probable cause." (internal quotation

20 marks and citations omitted)).

21        "To survive summary judgment on a claim of judicial

22 deception, a § 1983 plaintiff need not establish specific intent

23 to deceive the issuing court."  Bravo v. City of Santa Maria, 665

24 F.3d 1076, 1083 (9th Cir. 2011).  Rather, the plaintiff "must 1)

25 make a 'substantial showing' of deliberate falsehood or reckless

26 disregard for the truth and 2) establish that, but for the

27 dishonesty, the challenged action would not have occurred."

28 Liston, 120 F.3d at 962.  Under the second prong examining

40

whether "the warrant affidavit contained misrepresentations or omissions material to the finding of probable cause," Bravo, 665 F.3d at 1083, the court determines the materiality of the alleged false statements or omissions. Butler v. Elle, 281 F.3d 1014, 1024 (9th Cir. 2002). "[W]here probable cause is otherwise lacking, an officer who obtains a warrant by recklessly or intentionally including false statements (or omitting material facts) 'cannot be said to have acted in a reasonable manner and the shield of qualified immunity is lost.'" Liston, 120 F.3d at 972 (quoting Branch v. Tunnell, 937 F.2d 1382, 1387 (9th Cir. 1991), overruled on other grounds by Galbraith v. County of Santa Clara, 307 F.3d 1119, 1125 (9th Cir. 2002)).

   "The omission of facts rises to the level of misrepresentation only if the omitted facts cast doubt on the existence of probable cause." Ewing v. City of Stockton, 588 F.3d 1218, 1226 (9th Cir. 2009) (internal quotation marks and citation omitted). "[A] Fourth Amendment violation occurs where 'the affiant intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading.'" Liston, 120 F.3d at 973 (internal quotation marks and citation omitted). "Omissions or misstatements resulting from negligence or good faith mistakes will not invalidate an affidavit which on its face establishes probable cause." Ewing, 588 F.3d at 1224 (internal quotation marks and citations omitted). Under this prong, "[s]ummary judgment is improper where 'there is a genuine dispute as to the facts and circumstances within an officer's knowledge or what the officer and claimant did or failed to do.'" Bravo, 665 F.3d at 1087

41

1  (quoting Hopkins v. Bonvicino, 573 F.3d 752, 763 (9th Cir.

2  2009)); see also Bravo, 665 F.3d at 1087 (indicating that "clear

3  proof" is not required).

4       Under the second prong, which assesses whether

5  information omitted from an application for a warrant is

6  material, the court must "consider 'whether the affidavit, once

7  corrected and supplemented, establishes probable cause.'"  Id. at

8  1084 (quoting Ewing, 588 F.3d at 1224).  "The materiality

9  element--a question for the court--requires the plaintiff to

10  demonstrate that 'the magistrate would not have issued the

11  warrant with false information redacted, or omitted information

12  restored.'"  Smith v. Almada, 640 F.3d 931, 937 (9th Cir. 2011).

13  "If probable cause remains after amendment, then no

14  constitutional error has occurred."  Bravo, 665 F.3d at 1084.

15                1.   Russell's Psychological Background and

16                     Credibility

17       Plaintiffs first contend that the PCW was misleading

18  because it lacked information about Russell's history of

19  psychological and mental health issues, current and past

20  treatment, and cognitive function, which would have been relevant

21  in assessing the credibility of his accusations.  At the time she

22  drafted the PCW, Lopez knew that Russell had a "history of

23  aggressive behavior," was diagnosed as bipolar, identified as

24  emotionally disturbed, was on four "psychotropic" medications,

25  had a "history of hospitalizations," and was considered to have

26  an intellect of an eight-year-old "with low average intellect"

27  despite the fact he was twelve years old.  (Powell Decl. Ex. N.

28  at 1 (Docket No. 146-7).)  Plaintiffs also complain that the PCW

1  omitted the fact that the mandatory reporter who contacted CPS

2  was Russell's therapist.

3        The PCW correctly noted that CPS learned of Russell's

4  accusations of mistreatment at the Olvera/DeRose home through a

5  "referral from a mandated reporter."  Under California Penal Code

6  section 1166, mandatory reporting of child abuse is required only

7  "if the mandated reporter, in his or her professional capacity or

8  within the scope of his or her employment, has knowledge of or

9  observes a child whom the mandated reporter <u>knows or reasonably</u>

10 <u>suspects</u> has been the victim of child abuse or neglect."  Cal.

11 Penal Code § 11166(a) (emphasis added).  Thus, even if the PCW

12 included the entirety of Russell's emotional and mental history

13 and the fact that the mandatory reporter was his therapist, the

14 magistrate would have been left with the strong inference that

15 Russell's therapist--who was familiar with his emotional and

16 mental history--reasonably suspected that Russell's account of

17 what occurred was true.

18       Not only does the standard for mandatory reporting give

19 rise to the inference that Johanna Gale, the therapist treating

20 Russell who contacted CPS, did not believe Russell was lying,

21 Lopez's notes also reflect that Gale told Lopez that Russell "has

22 no history of excessive lying or making false allegations in any

23 written service record or at current placement."  (Powell Decl.

24 Ex. N at 1.)  It thus does not appear that Russell's treating

25 therapist, who was familiar with Russell's mental and emotional

26 history, believed that his history, diagnosis, or medications

27 undermined his credibility.  Nor has plaintiff cited authority

28 establishing that a child's veracity in reporting abuse should be

43

1  questioned solely because the child has a history of mental or
2  emotional conditions similar to Russell.[12]

3       The emotional and mental health of a child claiming
4  abuse does not raise the same concerns regarding that child's
5  credibility as, for example, an informant's self-interested
6  report of criminal activity.  In <u>United States v. Hall</u>, 113 F.3d
7  157 (9th Cir. 1997), the Ninth Circuit found that omission of a
8  critical informant's prior conviction for making a false report
9  to the police was material.  Not only was the omitted prior
10 conviction in <u>Hall</u> more directly linked to the informant's
11 credibility than the omitted information in this case, the Ninth
12 Circuit also emphasized that the police did not adequately
13 corroborate his statements and that it was likely the informant
14 was simply trying to "buy his way out of trouble by giving the
15 police someone 'up the chain.'"  <u>Hall</u>, 113 F.3d at 159-60.
16 Unlike a self-interested informant, Russell's account is more
17 akin to a citizen eye-witness or victim, whom courts generally
18 presume to be reliable.  <u>See</u> <u>Ewing</u>, 588 F.3d at 1224 ("[The
19 witness] was a citizen witness, not an informant, and such
20 witnesses are generally presumed reliable."); <u>United States v.</u>
21 <u>Blount</u>, 123 F.3d 831, 835 (5th Cir. 1997) ("'[C]itizen
22 informants,' 'identified bystanders,' victims and crime scene
23 witnesses may generally be presumed credible by police in a way

24

25       [12]   In his deposition, Dr. Ronald S. Federici testified
26 about how an autistic child is "probably a little bit out there
   and is not going to be again credible, reliable, valid."
27 (Federici Dep. 147:10-22.)  His testimony, however, was
   discussing a different child and linked to that child's autism.
28 (<u>See</u> <u>id.</u> at 144:3-148:1.)  Neither party has suggested that
   Russell was diagnosed with autism.

that professional informants are not."). Plaintiffs also have

not offered any evidence--let alone evidence known to Lopez at

the time she prepared the PCW--suggesting that Russell had a

motive to lie.

Nonetheless, Lopez indicated that she questioned the

veracity of two of the more egregious accusations Russell made.

First, Lopez recognized that Russell's statement to his therapist

that he had been shackled to his bed and subsequent denial to

Lopez that he had been shackled gave her some concern about

Russell's credibility. (Lopez Dep. 163:11-18.)  She speculated

that Russell's account of the shackling may have derived from an

incident in Tracey that was "all over the media" where a minor

child had recently been shackled in a foster home. (Id. at

162:24-165:4.)  Second, Lopez testified in her deposition that

she questioned whether a wound Russell showed her on his knee

could have really been caused by a tazer or been from the time

Russell lived at the Olvera/DeRose home. (See id. at 383:4-

385:5.)  When weighed against Russell's therapist's apparent

belief of his account and indication that Russell did not have a

history of lying, the omission of the aforementioned facts do not

sufficiently undermine Russell's credibility so as to constitute

misrepresentations.

Russell's account of what occurred at the Olvera/DeRose

home also gained indicia of reliability when significant parts of

his story were corroborated by DeRose and other children in the

Olvera/DeRose home during the December 19, 2008, interviews.  The

corroborating evidence was disclosed to the magistrate in the

PCW.  For example, Russell's account that DeRose placed him in a

cold shower was corroborated by DeRose's statement that she had

Russell take cold showers when he had bowl movements on himself.

(PCW at 2-4.)   Russell's statement that he was "subjected to

forcible physical restraints where he was held face down with his

wrists behind his back" was corroborated by GD-O's statement that

children at the Olvera/DeRose home are sometimes "'contained'" by

the adults and that "Russell was often held down with his hands

behind his back with Carla DeRose sitting next to him and Edward

Hansen-Olvera standing over him." (Id.)   DeRose also indicated

that the children were at times required to lie face down on the

floor while she sat next to the child or sat on the child if

needed, and she indicated she had sat on Russell a number of

times.[13]   (Id.)   Russell's indication that Olvera used a tazer on

him was partly corroborated by GD-O's statement that there was a

tazer device in the Olvera/DeRose home and that his parents had

conducted a demonstration regarding "what it does to someone"

and, although DeRose indicated that they no longer had a tazer in

the home, she indicated that one had been present in the home

when Russell lived there.   (Id.)   After determining that probable

cause existed to support the removal of CHD-O, Lopez was not

required to further corroborate Russell's statements.   See Ewing,

---

[13]     Plaintiffs take issues with the statement in the PCW
that DeRose admitted to utilizing "face down."   Plaintiffs do not
dispute that DeRose utilized the prone restraint technique that
has been described as "face down," only that she referred to it
as "containment," not "face down."   (See Pls.' Opp'n to Cnty.'s
Mot. at 60:15-18.)   Because the technique is described in the
PCW, the name used to describe the technique would not have
affected a determination of probable cause.   Moreover, because
counsel and the witnesses most frequently refer to the technique
as "face down," the court uses that title herein for clarity and
consistency.

588 F.3d at 1227 ("Once he has probable cause, an officer is not ordinarily required to continue to investigate or seek further corroboration."). Nonetheless, descriptions from other children and DeRose that were consistent with Russell's account increased the credibility of his statements and supported a finding of probable cause.

At the same time, however, the PCW omits statements by other children that arguably contradict Russell's account. Specifically, plaintiffs complain that the PCW omits the fact that Solla's interview notes indicated that RD-O "denied any inappropriate disciplining of Russell, or anyone else in the home" and SD-O "said no on [sic] here ever hurt Russell," that Russell was not "treated unfairly or differently than anyone else," and that "sometimes Russell had to be restrained to keep him from hurting anyone." (Powell Decl. Ex. GG at 1.)  The PCW also omitted DeRose's denial that Russell or any child had been tazed or threatened with a tazer. (Id. Ex. HH at 9.)  When weighed against other statements that corroborated Russell's account of what happened, the impressions about Russell's treatment by these children or denial of abuse by DeRose do not amount to misrepresentations and, even if they did, would not negate a finding of probable cause that CHD-O--who indicated that he was also required to do "face down"--was being subjected to potentially inappropriate discipline.

Moreover, even if a reasonable jury could find that the omissions misrepresented the credibility of Russell's account, the Ninth Circuit has repeatedly emphasized that the Fourth Amendment does not require inclusion of all exculpatory

1   evidence, see Beltran v. Santa Clara County, 389 Fed. App'x 679,

2   681 (9th Cir. 2010), and has upheld a warrant in the face of

3   omitted evidence that contradicted statements in the warrant

4   application.   In Ewing, officers obtained a warrant to search

5   plaintiffs' home for evidence of a murder based, in part, on an

6   identification of plaintiffs by one witness.   Ewing, 588 F.3d at

7   1226.   The warrant application did not, however, include the fact

8   that another witness did not identify plaintiffs when shown

9   various DMV photos that included plaintiffs.   Id.   The Ninth

10  Circuit concluded that, given the strength of the identification

11  by the one witness, omission of a non-identification by another

12  witness "does not cast doubt on probable cause."   Id. at 1226-27

13  (citing United States v. Colkley, 899 F.2d 297, 301 (4th Cir.

14  1990)).   Similarly, given the evidence that corroborated

15  significant portions of Russell's statements, the omission of

16  potentially conflicting evidence in the form of other children's

17  impressions of what they saw would not have precluded a finding

18  of probable clause.

19          Lastly, the PCW also indicates that AGD-O "corroborated

20  Russell W.'s statements regarding discipline" and includes

21  descriptions she had given of "face down," holding by DeRose in

22  the rocking chair, and children being sent to a "gray room."   The

23  statements are consistent with Lopez's notes of her interview

24  with AGD-O at the school on December 19, 2008.   (See Powell Decl.

25  Ex. HH at 12.)   In her deposition, however, AGD-O denied that she

26  told any of the social workers about "face down" or a "gray

27  room."   (AGD-O Dep. 36:20-41:23.)   The final sentence in that

28  paragraph, which states that AGD-O said Russell and her were

often sent to the "gray room" does not appear to have been memorialized in any interview notes and would seem factually impossible because AGD-O did not live in the home when Russell did and, when AGD-O lived with Olvera and DeRose, they lived in a different home than they did when Russell lived with them, (Olvera Dep. 286:2-10).

Similarly, the PCW stated that GD-O indicated that Russell was forced to take a cold shower when he had an "'accident'" at night.  Plaintiffs do not dispute that this statement is consistent with the notes of GD-O's interview. During his deposition, however, GD-O denied that he told any of the social workers that Russell or any other children were forced to take cold showers and indicated that the none of the social workers ever asked him about accidents.  (GD-O Dep. 28:2-6, 70:24-72:11.)

Assuming the truth of AGD-O's and GD-O's deposition testimony, as the court must on summary judgment, the aforementioned statements in the PCW attributed to AGD-O and GD-O misrepresented what they said in their interviews and therefore those statements must be excised and probable cause must be supported without the statements.  Nonetheless, these statements by AGD-O and GD-O were not critical to a finding of probable cause for the removal of CHD-O and, while they corroborated some of Russell's accusations, deleting them from the PCW does not affect the other corroborating statements previously discussed. The alleged misrepresentations regarding AGD-O and GD-O were therefore not material to a finding of probable cause.

                                          2.  <u>Alleged Misrepresentations and Falsities</u>

1           in Russell's Account

2          Plaintiffs first take issue with the statement in the

3   PCW that DeRose made Russell "sleep in the bathtub with no pillow

4   or blanket," (PCW at 2), when he had in fact told Lopez that he

5   was eventually allowed to return to his room to sleep in a bed

6   and was "sometimes" given a pillow or blanket, (Powell Decl. Ex.

7   N at 3).  The court doubts that a reasonable jury could find that

8   this statement constituted a misrepresentation.  Although

9   plaintiffs interpret the statement in the PCW to mean that

10  Russell was required to sleep in the shower all night and was

11  never given a pillow or blanket, the statement more accurately is

12  silent as to the duration of how long Russell slept in the shower

13  and whether he always did so without a pillow or blanket.  Even

14  if plaintiffs' interpretation is adopted, however, the statement

15  at most would be viewed as an exaggeration and it is hard to

16  conceive how it would have had any effect on a finding of

17  probable cause.  Cf. Ewing, 588 F.3d at 1224.

18         Second, plaintiffs contend that the PCW erroneously

19  indicated that Russell said he was "detained in closed areas to

20  the point he would smear his feces." (PCW at 2 (emphasis

21  added).)  Although the "Emergency Response Referral Information"

22  used this language, (see Powell Decl. Ex. X), Lopez's notes of

23  her interview with Russell indicated that he nodded his head when

24  asked whether he had to sleep in the shower "because he was

25  smearing his feces," (id. Ex. N at 3).  Assuming that smearing

26  fecal matter always preceded Russell having to sleep in the

27  shower, the discrepancy between the two versions is apparent from

28  the face of the PCW.  In the following paragraph in the PCW,

Lopez indicated that Russell also said that, "when he would have an uncontrolled bowel movement and would smear fecal matter," he was forced to sleep in the shower.  (PCW at 3.)  Lopez also indicated that DeRose said Russell "did spend a lot of time in the bathroom due to fecal smearing" and had to "take cold showers for having bowel movements on himself."  (Id. at 4.)

The PCW also describes that Russell would "smear fecal matter" after he had an "uncontrolled bowl movement."  (Id. at 3.)  It does not appear that Russell ever told Lopez that he had "uncontrolled" bowel movements, but only indicated embarrassment as to why he had to sleep in the shower.  In his interview with Moorer, CD-O also described Russell as intentionally "defecat[ing] in the room because he was mad."  (Powell Decl. Ex. AA at 1.)  Although placing Russell in the shower would seem more questionable if in fact his bowl movements were uncontrolled, it is unlikely a magistrate would have thought that CHD-O also had to sleep in the shower because nothing in the PCW suggests that he smeared fecal matter.  Thus, even assuming the inclusion of "uncontrolled" amounts to a misrepresentation, correcting the PCW to reflect that Russell's bowl movements were intentional would not have affected a finding of probable cause.

What appears to be the most significant error in the account of Russell's experience is the PCW's statement that Russell indicated "he was shackled to his bed."  (PCW at 2.) This statement appears to have been taken verbatim from the "Emergency Response Referral Information."  (Powell Decl. Ex. X at 1.)  Lopez's notes from her interview with Russell, however, indicate that he "denied allegation that he was ever shackled to

anything." (Id. Ex. N at 3.) Lopez also acknowledged that the discrepancy between Russell having told his therapist that he was shackled and then denying it to her gave her some concern about Russell's credibility. (Lopez Dep. 163:11-18.) The court finds that plaintiffs have at least shown that Lopez acted with a reckless disregard for the truth in omitting Russell's denial because the denial was made to her and memorialized in her notes.

The court must either assess whether probable cause remains after deleting the statement entirely or correcting the statement to indicate that Russell told his therapist he was shackled and then denied the shackling to Lopez. The latter correction appears to be the most accurate and favorable to plaintiffs because it could have alerted the magistrate to potential concerns about the credibility of Russell's account.

Addition of Russell's denial of having been shackled would have raised some doubt as to the credibility of his statements. It would not, however, have been "critical" to a finding of probable cause supporting the removal of CHD-O because the only discipline techniques directly linked to CHD-O were "strong sitting" and "face down." See Ewing, 588 F.3d at 1224. Even if the magistrate questioned Russell's credibility in indicating that those techniques were used in the home, the PCW contained other independent sources identifying the use of "strong sitting" and "face down," including CHD-O's indication that he was subjected to those forms of discipline and DeRose's recognition that those techniques were used in the home. Accordingly, the exclusion of Russell's denial of having been shackled was not material to a finding of probable cause

1   supporting the removal of CHD-O and therefore does not support

2   plaintiffs' claim that the PCW was obtained through judicial

3   deception.

4          Plaintiffs next take issue with the sentence concluding

5   the paragraphs about Russell in the PCW, which states: "The

6   declarant asked Russell W. if he had seen any other children be

7   subjected to the same treatment, he stated that two of the De

8   Rose/Hansen-Olvera children were treater similarly." (PCW at 3.)

9   Plaintiffs first complain that this statement neglects to

10  identify the two children Russell identified as having been

11  treated similarly, which were identified in a draft of the PCW as

12  CD-O and SD-O.  The court will therefore assume that a reasonable

13  jury could find that the reference to the two other children

14  could have led a magistrate to infer that CHD-O was one of those

15  children.  Plaintiffs have also shown that the decision not to

16  identify CD-O or SD-O was at least reckless because, as a prior

17  draft of the PCW identified them as the other children treated

18  similarly, Lopez knew Russell was referring those children.[14]

19

20         [14]   Excerpts of the draft PCW could have been removed by
    County counsel or other individuals for any number of reasons and
21  the court can only speculate as to those reasons.  For example,
    the draft PCW has a lengthy paragraph about Lopez's conversations
22  with Sutie Wheeler, District Manager for Adoption Services.  The
    paragraph could have been removed because, as plaintiffs suggest,
23  it indicates Wheeler had "worked with the [Olvera/DeRose] family
    for many years and she believed they offered significant services
24  to assist children that had been previously adopted." (Powell
    Decl. Ex. Q at 7.)  It could also have been removed because it
25  recounted several statements Lopez made to Wheeler about exposing
    the state to liability for having referred a family to an
26  unlicensed home.  (Id.)  It could also have been removed for
    entirely different reasons.
27         The court does not speculate as to why changes
    reflected in the final PCW were made or find that plaintiffs have
28  made a substantial showing of an intentional or reckless
    disregard for the truth because of the changes.  The court relies

1    Plaintiffs also complain that the PCW could be
2 interpreted as suggesting that the other two children were also
3 required to sleep in the shower, forced to take cold showers, and
4 tazed.  Of these acts, it is undisputed that CD-O and SD-O were
5 subjected only to the last act identified in the paragraph ("face
6 down").[15]  When the PCW is read in its entirety, the court finds
7 that a reasonable jury would not conclude that the sentence
8 misrepresents that the other two children or CHD-O were forced to
9 take cold showers, required to sleep in the shower, or tazed.
10 First, as discussed in more detail below, the PCW clearly links
11 Russell having slept in the shower and taken cold showers with
12 his smearing fecal matter and the PCW does not suggest that CHD-
13 O, or any other children, also smeared fecal matter.  Second, the
14 PCW limits the discipline that CHD-O and the other children claim
15 they experienced to "strong sitting" and "face down" and does not
16 suggest that they were tazed.

17    Lastly, it is worth noting that the court does not find
18 that Russell's account of what he experienced in the
19 Olvera/DeRose home, in itself, gave rise to probable cause to
20 remove CHD-O.  Russell's account of what occurred provided a

22 on the draft PCW only to show what was within Lopez's knowledge
23 when preparing the PCW.

24    [15]    Plaintiffs also argue that the PCW is flawed because it
omits CD-O's and SD-O's impression of "face down," namely that it
25 was a technique for a child to calm down and it did not make them
feel threatened.  The addition of the fact that CD-O and SD-O did
26 not share the similar negative impression of "face down" as
Russell appeared to have neither negates the veracity of
27 Russell's statement that he was subjected to the other forms of
discipline or would have precluded a magistrate from concluding
28 that there was a fair probability that the use of those
techniques posed a threat to CHD-O's health or safety.

background of why CPS initiated an investigation of the
Olvera/DeRose home, painted what could be viewed as an overall
concerning picture of what occurred in the home, and described
one of the discipline techniques ("face down") that CHD-O
reported being subjected to.

### 3.   Discipline Techniques

#### a.   "Strong Sitting"

        The PCW recounts DeRose as having described "strong
sitting" as "a technique utilized by practitioners of Attachment
Therapy, where children must sit silently cross-legged with their
arms down on the sides of their body supporting their weight."
(PCW at 4.)  Plaintiffs contend that the latter part of this
description is false as neither DeRose nor any of the children
indicated that "strong sitting" required the children to support
their weight with their arms.  In her deposition, Lopez explained
that this description of "strong sitting" came from her interview
with another child in which he did a physical demonstration of
the technique.  (Lopez Dep. 284:19-21.)  She testified that,
during the demonstration, AND-O did not "lift his entire body up"
and that his "buttocks or legs did not lift from the floor" but
"basically [] supported his weight with his arms straight down."
(Id. at 284:22-285:2.)  The issue is thus whether a reasonable
jury could find that the description of strong sitting as
requiring the children to "support[] their weight" misrepresents
the fact that the children were not required to lift, or attempt
to lift, their body off the ground and thereby support their
entire body weight with their arms.

        Based on the inclusion of "supporting their weight" in

the PCW along with the description of the technique described as "strong" sitting, a reasonable jury could find that "strong sitting" required the children to attempt to lift their body weight while in a seated position.  Defendants argue that, regardless of whether the technique demanded this of the children, the technique was one of the techniques Dr. Carmichael found concerning.  The PCW did not, however, indicate that Dr. Carmichael had reviewed the use of the technique or elaborate why the technique was harmful.  Dr. Carmichael's description of "strong sitting" also did not suggest that the children had to support their body weight.  (See O'Dea Decl. Ex. J ("Multiple children described similar interventions such as 'strong sitting' (i.e., sitting with demanded posture, with palms on floor, and eyes closed or covered with an eye-mask).").)

It is unlikely that a magistrate reviewing the PCW would have been familiar with techniques used by "practitioners of Attachment Therapy," and thus would be relying on the PCW to inform his or her decision as to whether use of the technique posed a risk to CHD-O's health or welfare.  A reasonable jury could conclude that the inclusion of "supporting their weight" misrepresented the technique so as to mislead a magistrate into viewing the technique as requiring the children to attempt to physically lift their body while sitting.  Based on the absence of any reference to being required to support one's weight in the children's and Dr. Carmichael's descriptions of "strong sitting" and Lopez's testimony that the demonstration she observed of the technique did not require the child to lift his body off the ground, plaintiffs have established a genuine issue of material

56

1  fact with respect to whether Lopez acted with at least a reckless

2  disregard for the truth in drafting the description of "strong

3  sitting."  The court must therefore delete this language from the

4  PCW and assess its materiality.

5                              b.   "Face Down"

6           Although the PCW describes "face down" in a way that

7  the court does not find to materially misrepresent what occurred,

8  the PCW primarily leaves it for the magistrate to determine

9  whether it was fairly probable that the use of the technique

10  endangered CHD-O's health or welfare.  Although Lopez had

11  obtained a professional opinion letter from Dr. Carmichael

12  concluding that the discipline techniques utilized in the home,

13  including "face down," posed a risk to the children's safety,

14  Lopez did not refer to Dr. Carmichael's review, letter, or

15  opinion in the PCW.

16           In addition to describing "face down" in the PCW, Lopez

17  concluded that Olvera and DeRose used "excessive and harmful

18  forms of discipline."  (PCW at 5.)  A magistrate would be likely

19  to assume that this conclusion extends to the use of "face down"

20  and would likely find it significant that a social worker viewed

21  the technique as "excessive and harmful."  The magistrate was not

22  informed, however, that Lopez herself utilized the technique that

23  has been described as "face down" when she worked in the

24  Sacramento Children's Home ("SCH").  (See Lopez Dep. 33:7-35:3,

25  164:8-23.)  Undoubtedly, a reasonable jury could find that the

26  description of "face down" as "excessive and harmful" without

27  mention of the fact that the same technique was lawfully utilized

28  at SCH misrepresented the potential harm CHD-O faced from the

1  technique.

2         In her deposition, Lopez explained that what made the

3  use of the technique acceptable at SCH and excessive in the

4  Olvera/DeRose home was that SCH was licensed and subject to

5  oversight whereas the Olvera/DeRose home was unlicensed and

6  therefore not subject to oversight or mandatory training.  (Id.

7  at 164:23-165:10, 166:17-167:5.)  The fact that the Olvera/DeRose

8  home was unlicensed, however, was omitted from the PCW and thus,

9  even assuming Lopez's distinction has merit, the PCW did not

10 purport to gain protective custody of CHD-O based on the fact

11 that the Olvera/DeRose home lacked a license.  A reasonable jury

12 could find that the omission of the use of "face down" at SCH

13 misrepresents the potential harm of the technique.  Plaintiffs

14 have shown that Lopez was at least reckless in propagating this

15 misrepresentation because she knew the technique was used in

16 licensed facilities and, despite relying on the lack of a license

17 to find that use of the technique was inappropriate in the

18 Olvera/DeRose home, did not indicate in the PCW that Olvera and

19 DeRose lacked a license.  The court must therefore correct the

20 PCW to indicate that the "face down" technique is utilized in

21 licensed children's homes and assess the materiality of the

22 omission.

23                    c.   Materiality Re: Discipline

24                         Techniques

25         After the aforementioned corrections are made, the

26 information in the PCW would still lead a magistrate to find it

27 probable that CHD-O was subjected to the "strong sitting" and

28 "face down" discipline techniques.  The issue, however, is

                                  58

whether the PCW contained sufficient evidence for a magistrate to
find probable cause that the use of those techniques endangered
CHD-O's health and welfare.  Although it is debatable, the court
assumes that requiring children to attempt to support their body
weight when "strong sitting" could be viewed as harmful.  If,
however, "strong sitting" was presented as only a discipline
technique in which "children must sit silently cross-legged with
their arms down on the sides of their body," it is difficult to
conclude that a magistrate would have believed that this
technique was excessive or harmful to CHD-O's health or welfare.

With "face down," the description of the technique,
along with Lopez's indications that it is an "excessive and
harmful form[] of discipline," likely supported the magistrate's
finding of probable cause.  The risk of harm to CHD-O's health or
welfare from the technique would have been less apparent,
however, if the magistrate was told the same technique is
utilized at licensed facilities.  Although the licensing and
oversight of those facilities could prevent the improper or
excessive use of the technique, Lopez herself testified that the
technique was administered in the same fashion as at the
Olvera/DeRose home and the PCW attacks the mere use of the
technique, not that it was used excessively or improperly.  With
knowledge that the technique was considered acceptable at
licensed homes, a magistrate would have at least questioned or
required additional information addressing whether the use of the
technique without any allegation that it was being used
improperly was harmful to CHD-O's health or welfare.  Cf. Bravo,
665 F.3d at 1086.

1                    4.   Alleged Sexual Abuse of CHD-O

2              One of the most significant allegations in the PCW

3 giving rise to probable cause and the only allegation of

4 misconduct that is unique to CHD-O is the alleged sexual abuse.

5 The PCW states:

> Social worker Solla asked [CHD-O] if anything has ever
> happened to him that was not okay. [CHD-O] said yes.
> [CHD-O] said that a child in the home by the name of [SD-
> O][16] rubbed his privates. [CHD-O] said he was lying on
> the floor in "Ma'am's" room near the bathroom door. [SD-
> O] lay next to him and she rubbed his penis over his
> clothes.  Social worker Solla asked what he was wearing,
> and he said "clothes like this."  [CHD-O] was wearing a
> tee-shirt and sweatpants.  Social Worker Solla asked
> [CHD-O] if he said anything to [SD-O].  [CHD-O] said he
> told her to stop but she would not, and she replied "sex
> is fun."  Social Worker Solla asked [CHD-O] if he told
> anyone and he said he told "Ma'am".  When asked what Ms.
> DeRose's response was, [CHD-O] said "Ma'am said she would
> know if it was true or not, and she didn't believe me".

14 (PCW at 4.)  The PCW also indicates that "DeRose was confronted

15 regarding the allegation made by the child, [CHD-O], of being

16 sexually abused by another child in the home, [SD-O].  Ms. DeRose

17 admitted to being aware of the allegation but stated that when it

18 was told to her, she didn't find that it was possible."[20]  (Id.)

19 This is the only allegation of sexual misconduct in the PCW and

20 the final paragraph of the PCW concludes, "the child has

21 disclosed sexual abuse in the care provider's home, yet Ms.

22 DeRose does not believe the child and has allowed the alleged

23

24     [16]   Although many of the exhibits refer to the child as "S-
D," defendants confirmed at oral argument that S-D and SD-O are

25 the same child.

26     [20]   Although the PCW states that "DeRose admitted to being
aware of the allegation," Lopez testified in her deposition that,

27 when she discussed the alleged incident with DeRose, DeRose
"stated that what she had been told was not what had been

28 reported by the children to either social worker Solla or to
Deputy Lemus."  (Lopez Dep. 295:16-21.)

1 perpetrator to remain in her home and access to the child [sic]."

2 (Id. at 5.)

3          The account of the sexual misconduct by SD-O in the PCW

4 is taken, almost verbatim, from Solla's notes of her interview

5 with CHD-O on December 19, 2008.  What is absent from the PCW,

6 however, is the fact that, after Solla interviewed CHD-O, Deputy

7 Lemus also interviewed CHD-O to follow-up on the claim of sexual

8 abuse.  In his report, Deputy Lemus memorialized that CHD-O made

9 the following statement to him:

> There is one time that I can think of that I was touched
> in a bad way.  I think it was maybe a month ago when [SD-
> O], who is 11, and I were talking to each other.  I was
> on time out for acting out, and Mam had me in the
> bathroom with the door closed.  I lay down on the
> bathroom floor, and I was next to the door, and I was
> talking through the door to [SD-O] and I [sic] at first
> were talking about our Spanish lessons that we had taken
> in our home-school class.  I knew it was [SD-O] by her
> voice when she was talking to me, and she was also lying
> down right next to the door.
>
> [SD-O] then told me a joke about sex, but I don't really
> remember how the joke went.  [SD-O] and I kept talking,
> and then [SD-O] told me, "I want to have sex with you,"
> and she reached underneath the door with her right hand
> and used her middle finger to rub my private."   My
> private is right here.  I told [SD-O] to stop talking to
> me about sex and to stop touching me.  [SD-O] stopped
> touching me, and we kept talking about our Spanish
> lessons some more.
>
> After I got off the time out, I told Mam about what [SD-
> O] did to me.  Mam then talked to me about it to make
> sure I was okay, and that I would be alright.  Other than
> that, I am okay.  [SD-O] has only touched me that one
> time, and no one else has ever touched me or made me feel
> scared or uncomfortable.
>
> I have not seen [SD-O] touch any of the other kids who
> live here.  [SD-O] and I get along good.  I am not scared
> of [SD-O].  I just didn't like how she touched my private
> that one time.

27 (Powell Decl. Ex. P at 5.)  The more detailed account CHD-O gave

28 to Deputy Lemus was consistent with DeRose's statement that the

61

alleged sexual misconduct could not have occurred because the children were on opposite sides of the bathroom door.  CHD-O also described this incident to Deputy Lemus as the "<u>one time</u> that I can think of that I was touched in a bad way."  (<u>Id.</u> (emphasis added).)[21]

Defendants contend that the incident reported to Deputy Lemus was omitted from the PCW because Lopez was unaware of it at the time she prepared the PCW.  However, "[i]n reviewing the materiality of challenged omissions, [the court] accept[s] as true the facts alleged by the [plaintiffs]."  <u>Liston</u>, 120 F.3d at 973.  Plaintiffs have submitted sufficient evidence that at least establishes a genuine dispute as to whether Lopez knew about the account CHD-O told Deputy Lemus.  First, at a detention hearing shortly after the issuance of the PCW, DeRose testified:

> A second intervention by the police was Miss Lopez told me that and the police officer that [CHD-O] had alleged he had been sexually assaulted by [SD-O].  I explained that circumstance in front of the police.  Miss Lopez insisted that I should have reported that and that there was more.  She wasn't willing to say there was more, what that more might be.  The police officer took [CHD-O] in the other room and interviewed him.  Came out again and said there's nothing here.  You have nothing other than what the mom has already told you.  They had a pretty heated discussion.

---

[21]   For the fist time in their reply, defendants discuss Deputy Takahashi's report from his interview with SD-O on December 19, 2008.  According to his report, SD-O reported an incident in which she touched CHD-O's penis over his clothes while they were in the bathroom with other children.  (Powell Decl. Ex. P at 6.)  SD-O's account of the events leading up to this incident vary significantly from either of CHD-O's accounts.  Although SD-O's account of what occurred would lend support for a finding of probable cause to take CHD-O into protective custody based on alleged sexual abuse, defendants do not contend that Lopez was aware of SD-O's account to Deputy Takahashi when she prepared the PCW.

1  (Powell Dec. Ex. II at 226.)   Second, Lopez also testified in her

2  deposition that, when she discussed the alleged incident with

3  DeRose, DeRose "stated that what she had been told was not what

4  had been reported by the children to either social worker Solla

5  or to Deputy Lemus."   (Lopez Dep. 295:16-21 (emphasis added).)

6  This explanation at least suggests that Lopez was aware that CHD-

7  O had spoken about the alleged incident with Deputy Lemus.

8  Lastly, Deputy Lemus testified that, based on how such

9  investigations typically occur, after he and Deputy Takahashi

10 interviewed the children, they "may have had a conversation apart

11 from the social workers, but . . . [it would be] a fair statement

12 that we conferred without the social worker as well after."

13 (Lemus Dep. 37:1-7.)[22]

14      The PCW also relied on DeRose's alleged inappropriate

15 response to CHD-O's claim of sexual misconduct to support

16 probable cause.   The PCW stated that "DeRose admitted to being

17 aware of the allegation [of sexual misconduct] but stated that

18 when it was told to her, she didn't find that it was possible."

19 (PCW at 4.)   In the final paragraph, the PCW concludes, "[CHD-O]

20 has disclosed sexual abuse in the care provider's home, yet Ms.

21 DeRose does not believe the child and has allowed the alleged

22 perpetrator to remain in her home and [have] access to the

23 child."   (Id. at 5.)   Inclusion of the incident as CHD-O reported

24 

25      [22]  Without citing to any evidence, plaintiffs also claim
   that, after Deputy Lemus interviewed CHD-O, DeRose took Deputy
26 Lemus and Lopez to the bathroom where the alleged incident
   occurred to demonstrate the impossibility of SD-O having reached
27 under the bathroom door.   Deputy Lemus does not recall whether
   such a demonstration occurred, (Lemus Dep. 28:20-24), and Lopez
28 denies that she observed any such demonstration, (Lopez Dep.
   294:10-23, 295:22-25).

it to Deputy Lemus, which is consistent with the incident as
DeRose claims it was told to her, would have illuminated why
DeRose concluded that it was not possible and made her inaction
seem less inappropriate.

The court therefore concludes that, assuming Lopez was
aware of the account of inappropriate touching that CHD-O told
Deputy Lemus, her exclusion of that account from the PCW
misrepresented what CHD-O claimed occurred and the reason for
DeRose's determination that the event was not possible.  Although
there is a genuine dispute about whether Lopez knew about the
account CHD-O reported to Deputy Lemus, when considered in light
the light most favorable to plaintiffs, a jury could conclude
that Lopez acted with at least a reckless disregard for the
truth.  The court must therefore supplement the PCW with the
account CHD-O reported to Deputy Lemus and determine whether the
omission was material.

As reported in the PCW, a magistrate had little reason
to question whether the alleged inappropriate touching of CHD-O
occurred as he claimed it did.  Cf. United States v. Banks, 539
F.2d 14, 17 (9th Cir. 1976) ("A detailed eyewitness report of a
crime is self-corroborating; it supplies its own indicia of
reliability.  The details of his statement supported an inference
as to the reliability of his information and his credibility.").
However, if the magistrate was also informed of the more detailed
account CHD-O reported to Deputy Lemus, the magistrate would have
questioned whether the claimed misconduct actually occurred.
Inclusion of the account told to Deputy Lemus would also have
illuminated why DeRose concluded that the incident was not

possible and made her allegedly insufficient response to CHD-O's claim of sexual abuse seem more reasonable.   When the allegation of sexual misconduct and DeRose's inadequate response to it were one of the central allegations related to CHD-O that supported the PCW, the court finds that omission of significant details CHD-O reported to Deputy Lemus would have caused a magistrate to question the allegations and require more evidence before concluding that there was a fair probability that CHD-O's health or safety was endangered based on alleged prior sexual misconduct by another child in the house and DeRose's inadequate response to it.

5.   <u>Absence of Interviews of Other Children</u>
<u>and Their Exculpatory Statements</u>

Plaintiffs contend that, during the December 19, 2008, interviews, each of the children interviewed indicated that they felt safe, happy, comfortable, or protected in the Olvera/DeRose home, but the PCW omitted these statements.   When describing the interview with CHD-O, however, the PCW states, "[CHD-O] reported that he feels safe at the home."   (PCW at 4.)   As the PCW was seeking the removal of CHD-O from the home, the fact that CHD-O felt safe was the most relevant exculpatory statement and would also carry more weight than similar statements by other children.

Moreover, at least two of the children's statements about feeling safe are not as exculpatory as plaintiffs suggest. Specifically, Solla's notes of her interview with K.A.M. reflect that she told Solla "that Maam told them to tell [the social workers] that they are safe and to say that they weren't hit or harmed."   (Powell Decl. Ex. GG at 3.)   Solla's notes also

65

reflect that K.T. said that "Maam told the kids to say that they
don't use any weapons in the home." (Id.)  Nonetheless, even
assuming that the children's statements about feeling safe had
exculpatory value, when considered in light of the inclusion of
CHD-O's statement that he felt safe and weighed against the
allegations in the PCW, exclusion of statements by all of the
children that they felt safe would not "prevent technically true
statements in the affidavit from being misleading." Liston, 120
F.3d at 973.

Plaintiffs also generally object to Lopez's failure to
include the fact of how many children were interviewed on
December 19, 2008, and the content of their interviews.  The
court has specifically examined any omission from the other
children's interviews that plaintiffs contend would have been
material to a finding of probable cause.  Defendants were not
required to present all of the evidence obtained and the mere
inclusion of the other children's interviews would not have been
material to a finding of probable cause to remove CHD-O.

6.   Omission of Information about the
Children the Olvera/DeRose Program
Served and Support Letters

Plaintiffs further contend that the PCW was obtained
through deceit because it omitted information about the nature
of the child population the program was serving, including the
children's emotional and behavioral issues.  The PCW was not,
however, silent as to the fact that CHD-O had emotional and
behavioral issues.  The PCW recited that Morrison and Miess
placed CHD-O in the Olvera/DeRose home "due to their inability

to care for the child in that 'he had become consistently and completely non-compliant with [them], sexually aggressive with their younger son and violent both at preschool and at home.'" (PCW at 4.)  The PCW also included ANG-O's description that a child was subjected to "face down" if the child was "violent in the home."  (Id. at 3.)  It is therefore unlikely that the reviewing judge would have believed that CHD-O or other children in the home did not suffer from emotional and behavioral issues.

Moreover, based on the investigation Lopez had performed, the evidence would not have supported the inference that the techniques used in the Olvera/DeRose home were acceptable simply because of the children's emotional and behavioral issues.  Most significantly, prior to seeking a PCW, Lopez sought and obtained an opinion letter from Dr. Blake Carmichael, the Manager of the Methal Health Services CAARE Center at U.C. Davis Children's Hospital.  Lopez requested Dr. Carmichael's opinion on the effects of the treatment practices utilized in the Olvera/DeRose home "on children with a prior history of abuse or neglect."  (O'Dea Decl. Ex. J at 1.)  He concluded that, "[a]fter carefully reviewing all of these materials, it is my opinion that the treatment/parenting practices identified in the documentation noted above, are cause for great concern with regard to the psychological, emotional, and physical well being of children."  (Id. at 4.)  Although Dr. Carmichael's opinion letter was not included in the PCW, his conclusions undermine plaintiffs' apparent assumption that the inclusion of the children's emotional and behavioral issues would have served an exculpatory value or affected the probable

67

1    cause determination.

2           Plaintiffs next object to the omission of any

3    reference to the numerous positive letters Lopez was provided

4    from parents who currently or previously had children in the

5    Olvera/DeRose home and from other individuals, including a

6    therapist, that emphatically tout the success and importance of

7    the program.  While representations from those individuals that

8    the Olvera/DeRose program was successful and safe conflict with

9    Lopez's conclusions about the program, the exclusion of

10   conflicting evidence does not necessarily negate a finding of

11   probable cause.  See Ewing, 588 F.3d at 1226-27.  Nor does

12   evidence that the program is successful in modifying the

13   children's behavior necessarily give rise to the inference that

14   the techniques utilized to modify their behavior are safe.

15   Moreover, Dr. Carmichael considered each of the letters when

16   preparing his opinion letter and their support for the program

17   did not affect his conclusion that the techniques were harmful.

18   At most, the letters show that parents and other individuals

19   disagreed with Lopez's conclusions about the program, not that

20   Lopez made material misrepresentations by omitting them from the

21   PCW.

22                    7.   Remaining Alleged Misrepresentations

23                              and Falsities

24           Plaintiffs object to the inclusion of the statement

25   that Olvera and DeRose were "inappropriate" care providers in

26   the first sentence of the PCW.  This statement, however, conveys

27   the conclusion that Lopez had reached and was supported by

28   evidence she had obtained.  It was clearly an opinion of the

                                68

social worker, not a misrepresentation of information.
Plaintiffs also object to the exclusion of Olvera's and DeRose's
extensive mental health training and experience with severely
emotionally disturbed children and adults.  While inclusion of
the evidence may have painted a more complete picture of Olvera
and DeRose, omission of their credentials or experience did not
"prevent technically true statements in the affidavit from being
misleading."  Liston, 120 F.3d at 973.  The mere fact that
Olvera and DeRose had extensive training and experience would
not give rise to the inference that they were incapable of
providing "inappropriate" care for children that endangered
their health or welfare.

Plaintiffs next complain that the PCW did not mention
the extensive camera surveillance system in the home that was
used to monitor the children even though the monitoring system
was described in the draft PCW.  Plaintiffs concede that the
presence of the video monitoring system is not "on its face
exculpatory."  (Pls.' Opp'n to Cnty.'s Mot. at 35:20.)
Moreover, while plaintiffs suggest favorable inferences that
could have been drawn given the presence of the monitoring
system, such as the lengths Olvera and DeRose went to in order
to ensure the children's safety, such evidence could equally
give rise to unfavorable inferences, such as the use of video
cameras to replace adequate adult supervision.  Ultimately,
omission of the evidence about the video monitoring system did
not amount to a misrepresentation, let alone a material
misrepresentation.

Lastly, plaintiffs dissect numerous other statements

69

in the PCW.  (<u>See</u> <u>id.</u> at 42 (when Russell was forced to take
cold showers), 43 (omission of what Russell felt when tazed), 44
(use of the word "forcible"), 45 (omission of fact that a child
could still breathe when in "face down"), 47 (omission of how
the restraints made Russell feel), 51 (addition of "to someone"
to GD-O's statement that there was a tazer demonstration to show
"what it does"), 62 (how DeRose actually described "sitting" on
a child during "face down"), 63 (inclusion of Miess's statement
that they were "more than thrilled that Carla and Ed want to
adopt [CHD-O]").)  It suffices to say that most of these
arguments appear to be more of a play on words by plaintiffs
than a demonstration of misrepresentations or falsehoods.  To
the extent a reasonable jury could find that one or more of
these distinctions amount to a misrepresentation, the court
finds that none of them would have any effect on a finding of
probable cause.  Moreover, it cannot be overlooked that the PCW
was for the removal of CHD-O, not Russell.  While Russell's
statements illustrate how CPS's investigation of the
Olvera/DeRose home began and paint an overall picture of the
Olvera/DeRose program, all of details of his experience were not
necessary to a finding of probable cause that CHD-O faced harm
due to the discipline techniques and alleged sexual misconduct.
Moreover, with the exception of Russell's statement that two
other children were "subjected to the same treatment," the PCW
leaves the impression that many of Russell's experiences were
unique to him.

In many of these arguments, plaintiffs also overlook
the fact that the Ninth Circuit has previously explained that

1  the Fourth Amendment does not "require that a warrant affidavit

2  include any information a plaintiff deems favorable to his or

3  her cause." Beltran, 389 Fed. App'x at 681.  An omission from a

4  warrant challenged based on judicial deception is material only

5  if it "renders an otherwise truthful statement to be false or

6  misleading." Id.  "[T]he omission rule does not require an

7  affiant to provide general information about every possible

8  theory, no matter how unlikely, that would controvert the

9  affiant's good-faith belief that probable cause existed . . . ."

10  United States v. Craighead, 539 F.3d 1073, 1081 (9th Cir. 2008).

11                      8.   Conclusion

12       The court finds that plaintiffs have established a

13  genuine issue of material fact whether Lopez, Schrage, Travis,

14  and Guillon acted at least recklessly in making three material

15  misrepresentations or omissions in the PCW: 1) inclusion of

16  "supporting their weight" in the description of "strong

17  sitting"; 2) omission of the fact that the "face down" technique

18  is utilized at licensed children's homes; and 3) omission of

19  CHD-O's conflicting account of the alleged sexual abuse as

20  reported to Deputy Lemus.  To withstand summary judgment, the

21  corrected PCW must "compel the conclusion that 'a neutral

22  magistrate would not have issued the warrant.'" Smith v.

23  Almada, 640 F.3d 931, 938 (9th Cir. 2011).

24       What is most troubling about the three aforementioned

25  omissions is that they relate to the only allegations of

26  mistreatment that are directly linked to CHD-O.  When the PCW is

27  supplemented to more accurately describe "strong sitting," the

28  acceptable use of "face down" in licensed homes, and the account

of the alleged sexual abuse told to Deputy Lemus, the ability of a magistrate to find it fairly probable that CHD-O's continued residence at the Olvera/DeRose home endangered his health or welfare is significantly depleted.  As the Ninth Circuit has explained, by "reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw." <u>Liston</u>, 120 F.3d at 973 (internal quotation marks and citation omitted). Here, the misrepresentation and omissions would have significantly manipulated the inferences the magistrate would have drawn about the likelihood CHD-O would face harm if he remained at the Olvera/DeRose home, especially because these omissions undermined the only evidence of mistreatment that was particular to CHD-O.[23]

Setting aside the "strong sitting," "face down," and alleged sexual abuse, the remainder of the allegations of mistreatment in the PCW are unique to other children and mostly pertain only to Russell, who no longer lived at the home.  While the overall depiction of Russell's account raises serious questions about what was occurring at the Olvera/DeRose home, the most significant allegation of shackling is also called into

[23]   In their reply, defendants explain that the risk of future harm CHD-O faced was based on "the circumstances under which CHD-O had been left in the home, the activities being conducted in the home, the presence of other violent children who needed to be physically restrained, and the use of controversial attachment therapies to treat these children." (Cnty.'s Reply at 20:11-16.)  The "circumstances under which CHD-O had been left in the home," as described in the PCW are not sufficient to support a finding of probable cause necessitating taking him into protective custody.  Similarly, the PCW neither indicates nor suggests that other violent children in the home posed a risk to CHD-O's health or safety.  Thus, the use of "face down," "strong sitting," and sexual abuse are the only allegations in the PCW directly linked to CHD-O's health or welfare.

1  question once the PCW is corrected.  Moreover, even if the

2  allegations in the PCW were sufficient to support a finding of

3  probable cause that Russell's health and welfare were endangered

4  when he was in the Olvera/DeRose home, this finding cannot be

5  simply transferred to CHD-O without any indication that CHD-O

6  posed similar behavioral problems, such as fecal smearing.

7         Overall, when the PCW is corrected to accurately

8  reflect the evidence in Lopez's knowledge about "strong

9  sitting," "face down," and the allegation of sexual abuse, the

10 court finds that, under the totality of the circumstances, a

11 neutral magistrate who was doing his or her job properly would

12 not have issued the PCW without, at a minimum, requiring

13 additional information to determine whether remaining in the

14 Olvera/DeRose home made it probable that CHD-O's health and

15 welfare would be endangered.  Plaintiffs have therefore

16 sufficiently established a genuine issue of material fact on

17 their claim that the PCW was obtained through judicial

18 misrepresentation in violation the Fourth Amendment.

19 Accordingly, the court the will deny defendants' motion for

20 summary judgment on CHD-O's second claim under § 1983 for

21 violation of his Fourth Amendment right.

22         4.  <u>Monell Claims</u>

23         "A municipality or other local government may be

24 liable under [§ 1983] if the governmental body itself 'subjects'

25 a person to a deprivation of rights or 'causes' a person 'to be

26 subjected' to such deprivation."  <u>Connick v. Thompson</u>, 131 S.Ct.

27 1350, 1359 (2011) (citing <u>Monell v. N.Y. City Dep't of Soc.</u>

28 <u>Servs.</u>, 436 U.S. 658, 692 (1978)).  Because § 1983 does not

impose vicarious liability, "[p]laintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." Id.

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." Id. at 1359. "To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" Id. (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 410 (1997). "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." Connick, 131 S.Ct. at 1360.

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Id. (quoting Bd. of Cnty. Comm'rs of Bryan Cnty, 520 U.S. at 409). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have

74

1  deliberately chosen a training program that will cause

2  violations of constitutional rights." Id.  In Canton, however,

3  the Court did not foreclose the possibility that, "in a narrow

4  range of circumstances," Bd. of Cnty. Comm'rs of Bryan Cnty.,

5  520 U.S. at 409, "the unconstitutional consequences of failing

6  to train could be so patently obvious that a city could be

7  liable under § 1983 without proof of a pre-existing pattern of

8  violations." Connick, 131 S.Ct. at 1361.

9        Here, plaintiffs contend that Sacramento County

10 provided inadequate training in the inclusion of exculpatory

11 evidence in protective custody warrants and "what the law

12 requires of government actors preparing and submitting a warrant

13 to invade another persons [sic] familial association and/or

14 rights of privacy." (Pls.' Opp'n to Cnty.'s Mot. at 79:7-15.)

15 Plaintiffs have neither alleged nor produced evidence

16 establishing a "pattern of similar constitutional violations" or

17 even a single similar constitutional violation.  At most,

18 plaintiffs established that none of the deposed social workers

19 recall an instance of another social worker having been

20 disciplined for failing to exclude exculpatory evidence in a

21 protective custody warrant application.  In the absence of any

22 evidence that prior violations have occurred, evidence of a lack

23 of discipline of employees does not give rise to the reasonable

24 inference that violations occurred, let alone that there had

25 been a pattern of similar constitutional violations.  Plaintiffs

26 must therefore pursue their Monell claim under the "single-

27 incident theory" and establish a triable issue of fact whether

28 the Fourth Amendment violation CHD-O allegedly suffered was a

75

"plainly obvious consequence" of failing to adequately train
social workers about preparing protective custody warrant
applications and including exculpatory evidence.

As a threshold matter, although plaintiffs argued that
the PCW contained numerous omissions and misrepresentations, the
court found that plaintiffs' Fourth Amendment claim of judicial
misrepresentation in obtaining the PCW could withstand summary
judgment on only three theories: 1) describing "strong sitting"
as requiring children to "support[] their weight"; 2) omitting
the fact that the "face down" technique was used at SCH; and 3)
omitting CHD-O's account to Deputy Lemus about the alleged
sexual misconduct.  Sacramento County's Monell liability and
plaintiffs' failure to train claim are therefore limited to
those theories as well.  See Long v. City of Honolulu, 511 F.3d
901, 907 (9th Cir. 2007) ("If no constitutional violation
occurred, the municipality cannot be held liable and whether
'the departmental regulations might have authorized the use of
constitutionally excessive force is quite beside the point.'"
(quoting City of Los Angeles v. Heller, 475 U.S. 796, 799
(1986))).

Defendants have submitted significant evidence
regarding Sacramento County's training program on protective
custody warrant applications.  Schrage began working for
Sacramento County CPS in 1986 and held several positions within
the Emergency Response unit and has been a program manager since
2001.  (Schrage Dep. 18:3-5, 19:6-20:2, 26:3-27:3, 29:13-14.)
As a program manager, Schrage's responsibilities included
"ensuring that policies and procedures are followed and

guidelines, training," which included internal training within
the department and mandatory outside training.  (Id. at 31:2-
20.)

Schrage testified that she and her staff were required
to attend training on protective custody warrants and that she
had attended a training on protective custody warrants prior to
February 2009.  (Id. at 38:10-12, 39:5-7, 40:2-5.)  She
indicated that "information was provided in the training by
County counsel about protective custody warrants, including
information about the process and what is contained within a
protective custody warrant" and that they were trained that
"[i]nformation contained in the warrant needed to include all
relevant facts that would be presented to County counsel for
their review."  (Id. at 40:5-11, 41:10-17; see also id. at
43:23-44:3 ("What I recall from the training is that we -- we
and I -- as the Department are required to inform the court of
all information -- of information known during the course of our
investigation when we are going forward with requesting an
application for a protective custody warrant, that we are
required.")  Schrage answered affirmatively when asked, "The
training you attended, did it indicate to you that a relevant
fact, even if a fact which when considered was contrary to the
idea that a child was at some substantial risk of harm, had to
also be included?"  (Id. at 44:11-16.)

Lake, who began as a social worker with CPS in 1987
and received numerous promotions until she became the division
manager of Family Reunification and Court Services in 2007,
(Lake Dep. 23:4-9, 42:5-21), testified that when CPS began the

77

practice of seeking protective custody warrants in November 2008, training was provided at that time and continued to be provided as the process and procedures in seeking protective custody warrants evolved. (Id. at 31:3-6, 32:1-10, 49:11-19.) Lake testified that mandatory training was developed by the program planner and County counsel, included written materials and a Power Point presentation, and "addressed what the different steps and responsibilities were involved in obtaining a warrant." (Id. at 49:21-50:1, 53:13-22, 54:10-15, 62:4-13.) She further testified that the training covered the "legal sufficiency" of protective custody warrants and addressed what information was required to be included, but she could not recall whether social workers were specifically instructed to include exculpatory evidence. (Id. at 55:14-17, 59:17-60:6, 61:25-62:7, 62:24-63:7.)

Coulthard, who began in the Emergency Response Program of Sacramento County CPS in 1985 and received several promotions before becoming a division manager of CPS in 2007, (Coulthard Dep. 26:15-16, 28:15), testified that in 2007 or 2008 the social workers received training on the existence of protective custody warrants and how and when to obtain them, (id. at 32:23-33:15).

Plaintiffs argue that Schrage's testimony reveals the inadequacy of the training because, even though she testified that the training addressed the inclusion of exculpatory evidence, she could not provide an accurate definition of "exculpatory." (See Schrage Dep. 40:19-42:25, 43:6-16; see also Schrage Dep. 42:9-17 (testifying that she believed "exculpatory" meant "information statements from another party received when

78

conducting the investigation"). Schrage's inability to define the term "exculpatory" does not, without more, create a genuine issue of material fact with respect to whether the training program was inadequate. The Fourth Amendment does not require that all exculpatory evidence be included; it only prohibits material misrepresentations or omissions. See Beltran, 389 Fed. App'x at 681. Schrage testified that she was trained to include all "relevant" information, including facts that were "contrary to the idea that a child was at some substantial risk of harm." This standard would include material exculpatory information and is therefore consistent with what the Fourth Amendment requires.

Coulthard was also unfamiliar with the term "exculpatory," but she had testified that she did not attend training on protective custody warrants because, as a division manager, her duties did not include preparing or submitting protective custody warrants. (Coulthard Dep. 33:18-24, 68:20-23.) Lake appeared to generally understand that "exculpatory" evidence referred to information that "mitigated or changes what you had presented [to the court]" and only seemed mistaken that it referred to evidence discovered after facts had already been presented to the court or a family. (See Lake Dep. 60:7-25.)

Plaintiffs also contend that the training was inadequate because Schrage did not recall whether any of the training included the content of Government Code section 820.21. Section 820.21 precludes social workers from receiving certain state statutory immunities if the social worker maliciously commits perjury, fabricates evidence, fails to disclose known exculpatory evidence, or obtains testimony by duress, fraud, or

79

undue influence.  Cal. Gov't Code § 820.21.  In questioning
Schrage about section 820.21, counsel did not allude to the
content of the section during her deposition, but merely asked
her if she had training on "section 820.21."  (See Schrage Dep.
49:11-19.)  The mere fact that Schrage was not familiar with the
section by number does not give rise to a reasonable inference
that the training did not did not instruct social workers that
information in a protective custody warrant application must be
truthful.  Moreover, even if the training did not cover section
820.21, this omission alone does not create a genuine issue of
material fact that the entirety of the training was inadequate.

        The only testimony plaintiffs have provided that is
potentially inconsistent with the aforementioned testimony about
Sacramento County's training program came from Cullivan.
Cullivan began working with Sacramento County CPS in April 2007
as a juvenile court investigator.  (Cullivan Dep. 31:1-14.)  As
a juvenile court investigator, Cullivan became involved in a
case after a child had been removed, and thus only prepared a
protective custody warrant in one case because she determined
that other children in the house also needed to be removed.
(Id. at 48:23-49:21.)  Cullivan testified that she received
training on preparing protective custody warrants and she
generally understood the term "exculpatory."  (Id. at 46:16-23,
48:19-22.)  At her deposition, she initially testified that she
was trained to include only the facts that supported removal in
a protective custody warrant and was not trained to include
exculpatory information.  (Id. at 49:23-50:7.)  After a break,
however, she clarified her testimony: "When we first started

doing protective custody warrants we were trained on including exculpatory information such as something like that the child is doing well in school.  After social workers had been doing -- submitting applications for some time, the court basically directed us to just stick to the facts and only include the facts that were in support of removal" because warrant applications were becoming too long.  (<u>Id.</u> at 51:17-25, 57:9-19.)  Cullivan testified that the instructions from the court were orally conveyed to her by a supervisor, but could not remember which supervisor or when she was told.  (<u>Id.</u> at 52:3-10, 54:8-17.)

Given that Cullivan was a juvenile court investigator and working in a separate unit of CPS, the court questions whether her testimony about the training she received is relevant to plaintiffs' claim that the social workers in the emergency response unit were inadequately trained.  In fact, Lake testified that the training for each unit was conducted separately, with social workers in the emergency response unit receiving their training first.  (<u>See</u> Lake Dep. 52:22-53:7 (testifying that the "training was also staggered so that we tried to focus on the audience to the group that was actually rolling [the new protective warrant policy] out.  So the first trainings were really focused to the Emergency Response social workers and the situations they might encounter . . . . [The employees] were encouraged to attend [training] with their own colleagues in the program.").)  Because juvenile court investigators usually did not seek protective custody warrants, it is likely that their training differed from the separate

81

1  training provided to social workers in the emergency response

2  unit.

3       Overall, the undisputed testimony from employees

4  familiar with the training provided to social workers in the

5  emergency response unit was that mandatory training was provided

6  and the social workers were instructed to include all relevant

7  evidence in a protective custody warrant.  "In virtually every

8  instance where a person has had his or her constitutional rights

9  violated by a city employee, a § 1983 plaintiff will be able to

10  point to something the city 'could have done' to prevent the

11  unfortunate incident," Canton, 489 U.S. at 392, "[b]ut showing

12  merely that additional training would have been helpful in

13  making difficult decisions does not establish municipal

14  liability." Connick, 131 S.Ct. at 1363.  In light of the

15  testimony from the employees within the emergency response unit,

16  plaintiffs have not established a genuine issue of material fact

17  with respect to the inadequacy of the County's training program

18  on protective custody warrants.

19       Nonetheless, even assuming plaintiffs submitted

20  sufficient evidence to establish a genuine issue of material

21  fact regarding the inadequacy of Sacramento County's training

22  program to withstand summary judgment, plaintiffs have failed to

23  establish a triable issue of fact whether the alleged

24  constitutional violations at issue in this case were a plainly

25  obvious consequence of the inadequate training program.

26       Schrage testified that, before an application for a

27  protective custody warrant was submitted to the court, it was

28  the required practice that "all of the relevant facts" are

82

provided to County counsel and County counsel "reviews our protective custody warrant application in their entirety before they are submitted to juvenile court." (Schrage Dep. 66:19-67:5; <u>see also</u> Schrage Dep. 131:25-3 ("I know for a hundred percent that someone from County counsel reviewed this before it went to the court. Nothing goes to the court without being reviewed by County counsel. No protective custody warrant application."), 36:1-7 (testifying that it was the "practice that the program manager was involved with the decision and staffing of County counsel").) She explained, "[i]n practice, County counsel does make recommendations and does ask for additional information and facts if needed before the warrant is submitted to the court." (<u>Id.</u> at 67:11-13.) Plaintiffs do not dispute that County counsel reviewed protective custody warrant applications and, in fact, the evidence in the case at hand confirms that County counsel was involved in preparing the PCW through the staffings and review of it. In 2009, social workers were also required to have their supervisors review a protective custody warrant before submitting it to County counsel or the juvenile court. (<u>Id.</u> at 123:5-24, 134:16-20.)

In <u>Connick</u>, the Court distinguished between the obviousness of a need to train police officers versus district attorneys. The Court first discussed the hypothetical involving police officers where the Court had previously suggested that a failure to train theory might survive in the absence of a pattern of similar violations:

> [A] city [] arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the

constitutional limitation on the use of deadly force. Given the known frequency with which police attempt to arrest fleeing felons and the "predictability that an officer lacking specific tools to handle that situation will violate citizens' rights," . . . a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the "highly predictable consequence," namely, violations of constitutional rights.

Connick, 131 S.Ct. at 1360.  In contrast, the Court held that the "[f]ailure to train prosecutors in their Brady obligations does not fall within the narrow range of Canton's hypothesized single-incident liability" because "[t]he obvious need for specific legal training that was present in the Canton scenario is absent []."  Id.  In "stark contrast" to police officers, who cannot be assumed to be familiar with the constitutional constraints on the use of deadly force, the Court reasoned that legal "[t]raining . . . differentiates attorneys from average public employees."  Id. (internal quotation marks and citation omitted) (alteration in original).  The Court concluded, "In light of th[e] regime of legal training and professional responsibility, recurring constitutional violations are not the 'obvious consequence' of failing to provide prosecutors with formal in-house training about how to obey the law."  Id. at 1363.

Here, assuming that social workers are akin to police officers and thus cannot be assumed to possess legal knowledge about what information must constitutionally be included in a protective custody warrant, County counsel, like district attorneys, "are trained in the law and equipped with the tools to interpret and apply legal principles, understand

84

1  constitutional limits, and exercise legal judgment." Id. at
2  1362.  Even if the County's training of the social workers was
3  inadequate, the consequences of the training program cannot be
4  assessed in a vacuum.  It is undisputed that the County's policy
5  required the social workers to provide County counsel with all
6  relevant evidence and that County counsel participated in the
7  staffings to determine whether a protective custody warrant
8  would be sought and, if it was, County counsel reviewed the
9  applications prior to its submission to the juvenile court.
10 Given the involvement of County counsel in the decision whether
11 to seek a protective custody warrant and the contents of any
12 application, the County was not on "actual or constructive
13 notice" that a "highly predictable" consequence of its failure
14 to adequately train the social workers in the constitutional
15 requirements of protective custody warrants was that social
16 workers would submit constitutionally deficient applications for
17 protective custody warrants.  See id. at 1365.

18      Accordingly, because plaintiffs have failed to
19 establish a genuine issue of material fact that the County's
20 training program on protective custody warrants amounts to
21 deliberate indifference to the rights of individuals like CHD-O,
22 the court will grant defendants' motion for summary judgment on
23 plaintiffs' Monell claim.[24]

24 _____

25      [24]  Because the court will grant defendants' motion for
   summary judgment on plaintiffs' Monell claims, it need not
26 address DHHS and CPS's argument that they cannot be named as §
   1983 defendants.  The court notes, however, that defendants'
27 reliance on United States v. Kama, 394 F.3d 1236 (9th Cir. 2005)
   is not as straight-forward as defendants suggest.  In a
28 concurring opinion in Kama, Judge Ferguson stated, "municipal
   police departments and bureaus are generally not considered

85

1              5.   County Counsel's Claim of Absolute Immunity

2         The parties do not dispute that defendants Travis and

3    _____

4    'persons' within the meaning of 42 U.S.C. § 1983." Kama, 394
     F.3d at 1239-40 (Ferguson, J., concurring).  Relying on this
5    language, numerous decisions in this district have held that
     municipal police and sheriff departments are not proper § 1983
6    defendants.  See, e.g., Wade v. Fresno Police Dep't, Civ. No.
     1:09-0599 AWI DLB, 2010 WL 2353525, at *4 (E.D. Cal. June 9,
7    2010); Brockmeier v. Solano Cnty. Sheriff's Dep't, Civ. No.
     2:05-2090 MCE EFB, 2006 WL 3760276, at *4 (E.D. Cal. Dec. 18,
8    2006).

9         The Ninth Circuit, however, has held that police and
     sheriff departments in California are "separately sueable
10   entit[ies]" and thus can be subject to liability under § 1983
     when acting for a county or city.  Streit v. County of Los
11   Angeles, 236 F.3d 552, 565 (9th Cir. 2001) (Los Angeles County
     Sheriff's Department); see also Shaw v. Cal. Dep't of Alcoholic
12   Beverage Control, 788 F.2d 600, 604-05 (9th Cir. 1986) (San Jose
     Police Department)

13        In Streit and Shaw, the Ninth Circuit began its
     analysis by explaining that, "[u]nder Rule 17(b) of the Federal
14   Rules of Civil Procedure, the Police Department's capacity to be
     sued in federal court is to be determined by the law of
15   California." Streit, 236 F.3d at 565 (quoting Shaw, 788 F.2d at
     604) (internal quotation marks omitted).  The court then looked
16   to California Government Code section 945, which provides that
     "[a] public entity may sue and be sued," and section 811.2, which
17   defines "public entity" to include "the state, the Regents of the
     University of California, the Trustees of the California State
18   University and the California State University, a county, city,
     district, public authority, public agency, and any other
19   political subdivision or public corporation in the State." Id.
     The Ninth Circuit then relied on a California Supreme Court
20   decision holding that a police department is a public entity
     under the California Evidence Code to find that "the courts of
21   California would hold that the Police Department is a public
     entity under section 811.2." Id. (quoting Shaw, 788 F.3d at 604)
22   (internal quotation marks omitted).

          When stating that "municipal police departments and
23   bureaus are generally not considered 'persons' within the meaning
     of 42 U.S.C. § 1983" in Kama, Judge Ferguson cited to an Eleventh
24   Circuit decision that affirmed dismissal of claims against a
     county sheriff department.  See Kama, 394 F.3d at 1240 (citing
25   Dean v. Barber, 951 F.2d 1210, 1214 (11th Cir. 1992)).  In Dean
     v. Barber, the Eleventh Circuit emphasized, "The question here is
26   not whether the Jefferson County Sheriff's Department is a
     'person' for the purposes of liability under Monell and section
27   1983, but whether the Department is a legal entity subject to
     suit." Dean, 951 F.2d at 1214.  The court concluded that,
28   because "a county sheriff's department lacks the capacity to be
     sued" under Alabama law, it could not be sued under § 1983. Id.
     at 1215.

                                86

1  Guillon served as County counsel for Sacramento County at all

2  times relevant to this case and that Travis was Guillon's

3  supervisor.  The TAC alleges, and Travis and Guillon do not

4  dispute,[25] that a "staffing" occurred on January 5, 2009, at

5  which Lopez, Fera, and Travis discussed how to proceed with the

6  case and decided to seek a protective custody warrant for CHD-O.

7  (Cnty. Counsel's Stmt. of Undisputed Facts No. 16 (Docket No.

8  129).)  The TAC further alleges that Travis and Guillon

9  participated in a second staffing on January 22, 2009, at which

10 the decision to seek a protective custody warrant for the

11 removal of CHD-O was affirmed.  (Id. No. 18.)  At that staffing,

12 the content of the protective custody warrant for CHD-O was

13 discussed and decisions were made about what to include or omit

14 from the warrant.  (Id.)  Travis and Guillon do not dispute that

15 Guillon also participated in drafting the PCW for CHD-O, but did

16 not sign it.  (Id. No. 19 (citing Guillon Dep. 63:23-64:14).)

17         Travis and Guillon contend that they are entitled to

18 absolute immunity for Travis's participation in the January 5,

19 2009, staffing, their participation in the January 22, 2009,

20 staffing, and Guillon's participation in drafting the PCW for

21 the removal of CHD-O.  "The burden to establish absolute

22

23         [25]    In their statement of undisputed facts, Travis and
   Guillon identify allegations from the TAC and request that the
24 court take judicial notice of the TAC.  In response, plaintiffs
   indicate that they do not dispute the allegations.  It is unclear
25 whether Travis and Guillon are indicating that they do not
   dispute the allegations in the TAC that they identify in their
26 statement of undisputed facts or request that, for purposes of
   their motion for summary judgment, the court simply assume those
27 allegations to be true.  The court will do the latter and assume,
   for purposes of this motion alone, that the allegations in the
28 TAC discussed in this section are undisputed.

87

immunity rests on the defendant who wishes to use it as a defense, and the 'presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties.'"  <u>Lacey v. Maricopa County</u>, 649 F.3d 1118, 1126 (9th Cir. 2011).

The Ninth Circuit has held that, based on the similarity in the functions performed by social workers to the functions performed by prosecutors, "social workers are entitled to absolute immunity in performing quasi-prosecutorial functions connected with the initiation and pursuit of child dependency proceedings."  <u>Meyers v. Contra Costa Cnty. Dep't of Soc. Servs.</u>, 812 F.2d 1154, 1157 (9th Cir. 1987).  In the same decision, however, the Ninth Circuit held that absolute immunity does not apply to social workers' actions that "preceded the institution of judicial proceedings."  <u>Id.</u> at 1155.  More recently, the Ninth Circuit clarified that social workers "are not entitled to absolute immunity from claims that they fabricated evidence during an investigation or made false statements in a dependency petition affidavit that they signed under penalty of perjury."  <u>Beltran v. Santa Clara County</u>, 514 F.3d 906, 908 (9th Cir. 2008) (per curiam).  Analogizing the functions performed by social workers to those of prosecutors, the court explained that a "prosecutor doesn't have absolute immunity if he fabricates evidence during a preliminary investigation, before he could properly claim to be acting as an advocate" and, "as prosecutors and others investigating criminal matters have no absolute immunity for their investigatory conduct, a fortiori, social workers conducting investigations

1  have no such immunity." Id. at 908-09.

2          In a prior order granting plaintiffs' motion to file

3  the TAC, this court rejected the social worker defendants' claim

4  that they were entitled to absolute immunity for their

5  participation in the January 22, 2009, staffing.  This court

6  explained that the misconduct by the participants of the January

7  22, 2009, staffing "preceded the institution of judicial

8  proceedings," Meyers, 812 F.2d at 1155, and, because the

9  participants in the staffing allegedly made decisions to omit

10  material information or include material misrepresentations, it

11  was not the type of function for which social workers are

12  entitled to absolute immunity under Beltran.  See Beltran, 514

13  F.3d at 908; see also Beltran, 389 Fed. App'x at 680-81

14  (applying only qualified immunity to claims that social workers

15  submitted a petition containing material misrepresentations and

16  omissions in support of a warrant to take custody of a minor

17  child).

18          In the order granting leave to file the TAC, the

19  parties did not address Travis and Guillon's immunity, and thus

20  the court expressly refrained from doing so.  In now asserting

21  absolute immunity, Travis and Guillon simply ignore Beltran's

22  limitation of absolute immunity available to  social workers and

23  argue they are entitled to absolute prosecutorial immunity.

24  Aside from the fact that they were serving as County counsel,

25  however, it is hard to distinguish Travis and Guillon's

26  participation in the staffings and Guillon's participation in

27  drafting the PCW from Lopez and the other social workers.

28          The Supreme Court has repeatedly emphasized that

89

absolute immunity "is justified and defined by the *functions* it
protects and serves, not by the person to whom it attaches."
Forrester v. White, 484 U.S. 219, 227 (1988); see Costanich v.
Dep't of Soc. & Health Servs., 627 F.3d 1101, 1108 (9th Cir.
2010) ("Interpreting the Supreme Court's decision in Kalina v.
Fletcher, 522 U.S. 118, 127-29 (1997), we recently reaffirmed
that it is only the specific function performed, and not the
role or title of the official, that is the touchstone of
absolute immunity." (internal quotation marks omitted)).  "When
determining whether a particular action qualifies as
prosecutorial, the court looks at 'the nature of the function
performed, not the identity of the actor who performed it.'"
Lacey, 649 F.3d at 1127 (quoting Kalina, 522 U.S. at 127).  In
participating in the staffings and drafting of the PCW, Travis
and Guillon were essentially serving the same function as social
workers and the court therefore finds it likely that they too
would be limited to claiming qualified immunity under Beltran.

        Moreover, even assuming that, as County counsel,
Travis and Guillon were serving a function distinct from the
social workers and therefore would not be precluded from
asserting absolute immunity under Beltran, their claim to
absolute immunity would still fail.  "A prosecutor is entitled
to absolute immunity from a civil action for damages when he or
she performs a function that is 'intimately associated with the
judicial phase of the criminal process.'"  Ewing, 588 F.3d at
1232 (quoting Imbler v. Pachtman, 424 U.S. 409, 430 (1976)).
"However, the functions of an advocate do not include advising
police officers whether probable cause exists during their

1  pretrial investigation and fabricating evidence before probable

2  cause has been established." Id. at 1233 (internal citations

3  omitted).

4         In Burns v. Reed, 500 U.S. 478 (1991), the Court held

5  that a prosecutor was entitled only to qualified immunity when

6  he advised police that probable cause existed to arrest the

7  plaintiff. Burns, 500 U.S. at 496. The Court explained,

8         Indeed, it is incongruous to allow prosecutors to be
           absolutely immune from liability for giving advice to
9         the police, but to allow police officers only qualified
           immunity for following the advice. Ironically, it would
10        mean that the police, who do not ordinarily hold law
           degrees, would be required to know the clearly
11        established law, but prosecutors would not.

12  Id. at 495. In light of Burns, the Ninth Circuit has emphasized

13  that "[t]he Supreme Court has clearly stated that with respect

14  to advising police, prosecutors are entitled to qualified not

15  absolute immunity." Ewing, 588 F.3d at 1233.

16         Travis and Guillon did not address Burns and the

17  limited immunity prosecutors receive when advising police. The

18  court does not see, however, how the function served in

19  participating in the staffings or drafting the PCW was anything

20  but advising the social workers about whether probable cause

21  existed for the removal of CHD-O and what information should be

22  included or excluded to facilitate a finding of probable cause.

23  Accordingly, Travis and Guillon have failed to show that they

24  are entitled to absolute immunity for participation in the

25  staffings or drafting of the PCW, and the court must therefore

26  deny their motion for summary judgment based on absolute

27  immunity.

28         6.   Intentional Infliction of Emotional Distress

1        Claims

2              a.   Lopez and Solla's December 19, 2008,

3                   Interviews

4              In their sixth claim, plaintiffs assert state law

5    intentional infliction of emotional distress ("IIED") claims

6    against Lopez and Solla based on their interviews of the minor

7    children plaintiffs on December 19, 2008.  Defendants claim

8    Lopez and Solla are immune from the IIED claims under California

9    Government Code sections 820.2 and 821.6.

10             California Government Code section 820.2 provides,

11   "Except as otherwise provided by statute, a public employee is

12   not liable for an injury resulting from his act or omission

13   where the act or omission was the result of the exercise of the

14   discretion vested in him, whether or not such discretion be

15   abused."  Cal. Gov't Code § 820.2.  "To determine which acts are

16   discretionary, California courts do not look at the literal

17   meaning of 'discretionary,' because '[a]lmost all acts involve

18   some choice between alternatives.'"  Martinez v. City of Los

19   Angeles, 141 F.3d 1373, 1379 (9th Cir. 1998) (quoting Caldwell

20   v. Montoya, 10 Cal. 4th 972, 981 (1995)).  "Rather, immunity

21   protects 'basic policy decisions,' but does not protect

22   'operational' or 'ministerial' decisions that merely implement a

23   basic policy decision."  Id.

24             Here, defendants rely on California Department of

25   Social Services Regulations 31-125.1 and 31-125.23 as vesting

26   social workers with discretion in investigating allegations of

27   child abuse.  Regulation 31-125.1 provides:

28        The social worker initially investigating a  referral

                                   92

> shall determine the potential for or the existence of any conditions(s) which places the child, or any other child in the family or household, at risk and in need of services and which would cause the child to be a person described by Welfare and Institutions Code Sections 300(a) through (j).

Regulation 31-125.23 provides:

> If as a result of the investigation the social worker has determined the referral is not unfounded, and has completed the requirements in Section 31-125.22 and documented the results in the case record, the decision whether to conduct an in-person investigation with any additional children who were not present at the initial in-person investigation shall be at the discretion of the county.

The California Supreme Court has explained that "classification of the act of a public employee as 'discretionary' will not produce immunity under section 820.2 if the injury to another results, not from the employee's exercise of 'discretion vested in him' to undertake the act, but from his negligence in performing it after having made the discretionary decision to do so." McCorkle v. City of Los Angeles, 70 Cal. 2d 252, 261 (1969). In McCorkle, the California Supreme Court held that, even if a police officer "exercised his discretion in undertaking his investigation" of an accident, "section 820.2 did not clothe him with immunity from the consequences of his negligence in conducting it." Id. The court explained:

> [The officer] would have been immune if plaintiff's injury had been the result of [the officer's] exercise of discretion. It was not: it resulted from his negligence after the discretion, if any, had been exercised. Because the essential requirement of section 820.2--a causal connection between the exercise of discretion and the injury--did not exist, the statutory immunity does not apply.

Id.

93

Similarly, in Barner v. Leeds, 24 Cal. 4th 676 (2000), the California Supreme Court held that, even if the decision whether to appoint a public defender is a discretionary decision and "even though a deputy public defender's actual representation of a client requires the exercise of considerable skill and judgment, such representation generally does not involve discretionary acts within the meaning of section 820.2." Barner, 24 Cal. 4th at 688. The court thus concluded that section 820.2 did not immunize a public defender's alleged negligent misrepresentation because his "services consist of operational duties that merely implement the initial decision to provide representation and are incident to the normal functions of the office of the public defender." Id.

In contrast to McCorkle and Barner, the Third District Court of Appeal more recently held that section 820.2 immunized a social worker from a claim that the social worker performed an "*inadequate* investigation." Ortega v. Sacramento Cnty. Dep't of Health & Human Servs., 161 Cal. App. 4th 713, 732 (3d Dist. 2008). In Ortega, the arrest of the child's father mandated the social worker to perform a particular investigation, but the social worker failed to gather the enumerated sources in the CPS handbook, and defendants conceded that the social workers' investigation was "'lousy'" and ultimately resulted in the social worker making the wrong determination about returning the child to the custody of her father. Id. at 728, 731. The court nonetheless concluded that the social worker was immune under section 820.2 because she "made a considered decision balancing risks and advantages," even though she did so based on "woefully

94

1    inadequate information."   Id.

2          Other courts have also taken a more expansive view
3    than McCorkle in extending section 820.2 immunity to allegedly
4    inadequate or negligent investigations by social workers.   See,
5    e.g., Jacqueline T. v. Alameda Cnty. Child Protective Servs.,
6    155 Cal. App. 4th 456 (1st Dist. 2007) (granting immunity under
7    sections 820.2 and 821.6 for the "failure to conduct a
8    reasonable and diligent investigation"); Alicia T. v. County of
9    Los Angeles, 222 Cal. App. 3d 869, 882 (2d Dist. 1990)
10   (rejecting plaintiffs' argument that "the investigative nature
11   of a social worker's employment is ministerial and not
12   discretionary"); Guzman v. County of Alameda, Civ. No. 10–2250
13   MEJ, 2010 WL 3702652, at *8 (N.D. Cal. Sept. 10, 2010)
14   ("[C]ourts have recognized immunity for social workers in their
15   investigations of child abuse complaints."); Clarke v. Upton,
16   Civ. No. 1:07-888 OWW SMS, 2008 WL 2025079, at *17 (E.D. Cal.
17   May 9, 2008) ("The immunity set forth in Section 820.2 applies
18   to claims of negligent and intentional conduct alleged in
19   connection with a child abuse investigation . . . .").

20         In Newton v. County of Napa, 217 Cal. App. 3d 1551
21   (1st Dist. 1990), the court similarly held that section 820.2
22   provided immunity for claims for "'failing to properly,
23   thoroughly and completely investigate the source and basis for
24   the underlying [child abuse] complaint,'" but "did not extend[]
25   'beyond actions implied in the decision to investigate' to
26   'gratuitous actions, unnecessary for a proper investigation.'"
27   Jacqueline T., 155 Cal. App. 4th at 467-68 (quoting Newton, 217
28   Cal. App. 3d at 1561-62) (alteration in original).   The Newton

95

1   court explained that the immunity "must embrace further actions
2   necessary to make a meaningful investigation, but it does not
3   exclude the possibility of tortious conduct in making the
4   investigation." Newton, 217 Cal. App. 3d at 1561. Thus, "the
5   county was [] not immune for such gratuitous actions as causing
6   the minors to disrobe and stand naked in the presence of
7   strangers and failing to seek or receive voluntary consent to
8   disrobe them." Jacqueline T., 155 Cal. App. 4th at 467-68
9   (citing Newton, 217 Cal. App. 3d at 1562 & n.5).

10       The Ninth Circuit has recognized that section 820.2
11  "applies to county social workers engaged in investigating
12  allegations of child abuse." Wallis v. Spencer, 202 F.3d 1126,
13  1144 (9th Cir. 2000). Citing Newton, the court has explained
14  that the "immunity provides complete protection for the decision
15  to investigate . . . and for actions necessary to make a
16  meaningful investigation[, but] does not extend[] to
17  non-discretionary actions or to at least some intentional torts
18  committed in the course of making the investigation, such as
19  battery and false imprisonment." Id. at 1145

20       Here, plaintiffs' IIED claim is neither based on
21  Lopez's and Solla's decisions to conduct the interviews on
22  December 19, 2008, nor on any allegations of negligence in
23  performing their investigation. It is limited to Lopez's and
24  Solla's alleged failures to obtain consent to conduct the
25  interviews and their use of coercive interview techniques.
26  Although courts have applied section 820.2 broadly to social
27  workers' investigations, extending immunity under the facts of
28  this case would be hard to reconcile with McCorkle, Barner, and

96

1  <u>Newton</u>.  Nor have defendants articulated how Lopez and Solla, in

2  allegedly coercing interviews of the children, "made a

3  considered decision balancing risks and advantages."  <u>See</u>

4  <u>Ortega</u>, 161 Cal. App. 4th at 733.  To the contrary, even

5  assuming Lopez's and Solla's decisions to perform the interviews

6  constituted an exercise of discretion, their alleged decisions

7  to do so without consent and through coercive techniques cannot

8  be deemed a discretionary decision under section 820.2.  Lopez

9  and Solla are therefore not immune from plaintiffs' IIED claim

10 under section 820.2.

11     Defendants next contend that California Government

12 Code section 821.6 immunizes Lopez and Solla from plaintiffs'

13 IIED claim.  Section 821.6 provides, "A public employee is not

14 liable for injury caused by his instituting or prosecuting any

15 judicial or administrative proceeding within the scope of his

16 employment, even if he acts maliciously and without probable

17 cause."  "For purposes of this immunity provision,

18 investigations are deemed to be part of judicial and

19 administrative proceedings."  <u>Strong v. State</u>, 201 Cal. App. 4th

20 1439, 1461 (2d Dist. 2011); <u>accord</u> <u>Blankenhorn v. City of</u>

21 <u>Orange</u>, 485 F.3d 463, 488 (9th Cir. 2007).

22     Courts have repeatedly applied immunity under section

23 821.6 to social workers' conduct during investigations.  <u>See</u>

24 <u>Jacqueline T.</u>, 155 Cal. App. 4th at 468; <u>Alicia T.</u>, 222 Cal.

25 App. 3d at 883; <u>Jenkins v. County of Orange</u>, 212 Cal. App. 3d

26 278, 283-85 (4th Dist. 1989); <u>see also</u> <u>Asgari v. City of Los</u>

27 <u>Angeles</u>, 15 Cal. 4th 744, 756-57 (1997) ("Although Government

28 Code section 821.6 has primarily been applied to immunize

97

prosecuting attorneys and other similar individuals, this section is not restricted to legally trained personnel but applies to all employees of a public entity." (internal quotation marks and citations omitted)).  Plaintiffs have not cited any authority demonstrating why allegations of coercion would preclude immunity under section 821.6's broad grant of immunity and, in fact, the Ninth Circuit has recognized that the immunity has been extended to analogous conduct.  See Blankenhorn, 485 F.3d at 488 (citing a California appellate case granting immunity under section 821.6 for "taking rape and attempted murder victim against her will to the crime scene and later telling neighbors that she was lying about what happened").

Plaintiffs nonetheless contend that California Government Code section 820.21 precludes Lopez and Solla from receiving immunity under section 821.6.  Section 820.21 provides:

> (a) Notwithstanding any other provision of the law, the civil immunity of juvenile court social workers, child protection workers, and other public employees authorized to initiate or conduct investigations or proceedings pursuant to Chapter 2 (commencing with Section 200) of Part 1 of Division 2 of the Welfare and Institutions Code shall not extend to any of the following, if committed with malice:
> (1) Perjury.
> (2) Fabrication of evidence.
> (3) Failure to disclose known exculpatory evidence.
> (4) Obtaining testimony by duress, as defined in Section 1569 of the Civil Code, fraud, as defined in either Section 1572 or Section 1573 of the Civil Code, or undue influence, as defined in Section 1575 of the Civil Code.

Based on the court's prior findings that plaintiffs established a genuine issue of material fact with respect to whether DeRose

1  consented to the interviews of the minors on December 19, 2008,

2  section 820.21(a)(4) could potentially limit Lopez's and Solla's

3  immunity if the statements contained through the interviews at

4  the Olvera/DeRose home constitute "testimony" under section

5  820.21.

6  Section 820.21 does not define "testimony" and neither

7  party cited any authority shedding light on its definition in

8  that section.  The general definition of "testimony" suggests

9  that the statements must be made under oath or affirmation, such

10  as would occur during a trial or deposition.  See Black's Law

11  Dictionary (9th ed. 2009) (defining "testimony" as "[e]vidence

12  that a competent witness under oath or affirmation gives at

13  trial or in an affidavit or deposition").  The other enumerated

14  conduct in which the social worker could lose immunity under

15  section 820.21 (perjury, fabrication of evidence, and failure to

16  disclose exculpatory evidence) also suggests that the section

17  was intended to extend to conduct occurring during or after the

18  initiation of judicial proceedings.

19  The Legislative Analyses explain that one of the

20  primary reasons for enacting section 820.21 was concern that

21  social workers' immunity was too expansive, see, e.g., S. Rules

22  Comm., Comm. Analysis of AB 1355 (Sept. 8, 1995), but they do

23  not discuss the intended definition of "testimony."  The

24  amendments to the bill that enacted section 820.21, however,

25  suggest that the Legislature intended the section to cover only

26  conduct closely-related with the judicial process.  As initially

27  introduced, AB 1355 proposed to limit social workers' immunity

28  to "be the same as the civil immunity provided by law to peace

1  officers," which would have provided social workers with only

2  qualified immunity.  AB 1335 (Feb. 23, 1995).  After amendment

3  in the Senate on August 25, 1995, the bill proposed to preclude

4  immunity for "(a) Offering perjured testimony.  (b) Fabrication

5  of evidence.  (c) Knowingly failing to disclose exculpatory

6  evidence.  (d) Coercion of any party to the investigation or

7  proceeding. [and] (e) Initiating or conducting an investigation

8  or proceeding to achieve or gain a personal advantage or

9  profit."  Here, the proposed subsection (d) would have more

10 clearly extended to the interviews in this case.  In the third

11 and final amendment by the Senate less than two weeks later,

12 "coercion of any party to the investigation or proceeding" was

13 removed, the malice requirement was added, and the categories of

14 conduct were limited to the four categories ultimately enacted

15 in section 820.21.  These amendments suggest that, while AB 1335

16 initially posed a drastic limitation on social workers'

17 immunities, the Legislature continued to limit the scope of the

18 bill with it ultimately extending only to conduct traditionally

19 associated with the judicial process.  The court therefore finds

20 that "testimony" in section 820.21 was not intended to include

21 in-home interviews that were neither under oath or in connection

22 with an on-going judicial proceeding.

23        Accordingly, because Lopez and Solla are entitled to

24 immunity under section 821.6 for their alleged coercive conduct

25 during the interviews on December 19, 2008, the court must grant

26 defendants' motion for summary judgment on plaintiffs' IIED

27 claim against those defendants.

28             b.   Robin Rogers Requiring Children to Appear in

100

Juvenile Court

In their opposition, plaintiffs clarify that their seventh claim for IIED is alleged by all plaintiffs except Morrison and Miess and against only Robin Rogers based on her demand that the minor children plaintiffs repeatedly pack their bags and appear in juvenile court under the threat that they could be removed if they failed to appear. (Pls.' Opp'n to Cnty.'s Mot. at 97:8-16.)

The elements for the tort of intentional infliction of emotional distress are "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." Christensen v. Superior Court, 54 Cal. 3d 868, 904 (1991) (internal quotation marks and citation omitted). Because defendants initially limited their request for summary judgment on this claim to arguing that they were immune, their opening briefs did not address the merits and plaintiffs' opposition relating to the merits is minimal at best. For the first time in their reply, defendants appear to abandon any claim of immunity and address the merits of the claim.

Although both parties raise pro forma arguments about whether Rogers' alleged conduct could satisfy the first two elements of an IIED claim, neither party cites any case law. As the party carrying the initial burden, defendants also fail to cite a single case in support of an argument that Rogers'

101

1  alleged conduct cannot give rise to an IIED claim as a matter of

2  law.  With the limited factual development of the claim and lack

3  of any authority suggesting the claim can be resolved as a

4  matter of law, the court finds that defendants have failed to

5  carry their initial burden in seeking summary judgment and will

6  deny defendants' motion for summary judgment on the seventh

7  claim with respect to Rogers and, in light of plaintiffs'

8  clarification, will grant defendants' motion for summary

9  judgment on the seventh claim with respect to all other

10 defendants.

11         IT IS THEREFORE ORDERED that:

12     (1) plaintiffs' motion to appoint DeRose as guardian ad

13 litem for plaintiffs AND-O, CHD-O, COD-O, SD-O, AGD-O, GD-O, and

14 RD-O nunc pro tunc to the date this action was filed be, and the

15 same hereby is, GRANTED;

16     (2) plaintiffs' fifth claim under § 1983 against all

17 defendants based on violations of plaintiffs' First Amendment

18 rights of association and all claims against Fermine Perez,

19 Laura Coulthard, Lynn Frank, Joni Edison, Keeva Pierce,

20 Stephanie Lynch, Veronica Carrillo, Fred Demartin, Kim Pearson,

21 Patti Gilbert-Driggs, and Melinda Lake be, and the same hereby

22 are, DISMISSED with prejudice;

23     (3) defendants' motion for summary judgment on the first

24 claim under § 1983 for violation of the Fourth Amendment against

25 Lopez and Solla be, and the same hereby is, DENIED;

26     (4) defendants' motion for summary judgment on the eighth

27 claim under § 1983 for violation of the Fourth Amendment be, and

28 the same hereby is, DENIED as to Christian and GRANTED as to all

1  remaining defendants;

2      (5) defendants' motion for summary judgment on the third

3  and fourth claims under § 1983 for violations of plaintiffs'

4  rights to familial association be, and the same hereby is,

5  GRANTED;

6      (6) defendants' motion for summary judgment on CHD-O's

7  second claim under § 1983 for a violation of his Fourth

8  Amendment rights be, and the same hereby is, GRANTED as to all

9  defendants except Lopez, Schrage, Travis, and Guillon;

10     (7) County of Sacramento, DHHS, and CPS's motion for

11  summary judgment on all <u>Monell</u> claims be, and the same hereby

12  is, GRANTED:

13     (8) Travis and Guillon's motion for summary judgment on the

14  ground of absolute immunity relating to the staffings and

15  drafting of the PCW be, and the same hereby is, DENIED;

16     (9) defendants' motion for summary judgment on the sixth

17  claim for IIED be, and the same hereby is, GRANTED; and

18     (10) defendants' motion for summary judgment on the

19  seventh claim for IIED be, and the same hereby is, DENIED as to

20  Rogers and GRANTED as to all remaining defendants.

21  DATED:  March 18, 2013

22

23                          WILLIAM B. SHUBB
                            UNITED STATES DISTRICT JUDGE
24

25

26

27

28

103